**Ada Margaret ZIPKIN, Respondent,**

v.

**Robert F. FREEMAN, Defendant,**

**Medical Protective Company, Appellant.**

No. 53160.

Supreme Court of Missouri,
En Banc.

Dec. 31, 1968.

Rehearing Denied Feb. 10, 1969.

George A. Spencer, Spencer & Petri, Columbia, for plaintiff-respondent.

William B. Anderson, Anderson, Gilbert, Wolfort, Allen & Bierman, St. Louis, for garnishee-appellant.

SEILER, Judge.

In this garnishment proceeding the principal contention of appellant is that none of the activities and conduct of its insured, Dr. Robert F. Freeman, a psychiatrist, for which a jury awarded respondent $17,000 damages, amount to professional services rendered or which should have been rendered in the practice of his profession, for which the appellant insurer agreed to pay damages under its Medical Protective policies issued to Dr. Freeman, and hence the insurer was under no duty to defend the original damage suit or pay any judgment therein.

The policies contained this insuring agreement: "In Consideration of the payment of the premium * * * the Company hereby agrees to DEFEND and PAY DAMAGES, in the name and on behalf of the Insured or his estate, A. IN ANY CLAIM OR SUIT FOR DAMAGES, AT ANY TIME FILED, BASED ON PROFESSIONAL SERVICES RENDERED OR WHICH SHOULD HAVE BEEN RENDERED DURING THE TERM OF THIS POLICY, BY THE INSURED OR ANY OTHER PERSON, IN THE PRACTICE OF THE INSURED'S PROFESSION: * * *." It is admitted by appellant that Dr. Freeman notified it of respondent's suit against him and requested it to defend him, which appellant declined to do. Nothing was done about seeking a declaratory judgment or defending under a reservation of rights agreement or notice thereof. The damage suit was tried in May 1963, and Dr. Freeman was defended by counsel retained personally by him.

■ Ordinarily the insurer's duty to defend is determined from the policy provisions and the allegations of the petition, Northwestern Mutual Insurance Co. v. Haglund (Mo.App.), 387 S.W.2d 230, 233, although the insurer cannot safely " * * * ignore actual facts (known to it or which could be known from reasonable investigation) * * * [meaning] * * * the facts which were known, or should have been reasonably apparent at the commencement of the suit and not the proof made therein or the final result reached. * *", Marshall's United States Auto Supply v.

Maryland Casualty Co., 354 Mo. 455, 189 S.W.2d 529, 531.

The petition in the damage suit which the defendant was called upon to defend alleged that the doctor was a practicing physician in Columbia, Missouri, holding himself out as being skilled in the field of psychiatric treatment; that plaintiff was troubled with a case of diarrhea and headaches and started treatment with Dr. Freeman about April 18, 1959; that the doctor, for a consideration, took charge of her as a patient to treat her and treated her during 1959, 1960 and part of 1961; that he by his treatment and counselling so aroused her emotions that she was in love with him; that he wrongfully manipulated the situation to the point where her feelings were no longer simply transferred feelings of love for the psychiatrist but direct feelings of love for him as a person, beyond the phenomenon of transference,[1] which was a departure from the accepted standard of practice; that the doctor negligently advised plaintiff she needed further treatment by way of personal and social contacts with him even though such a relationship went beyond accepted psychiatric standards.

The petition further alleged that as a result of the control the doctor exercised over her, plaintiff was unable to direct herself properly and at the doctor's direction under the guise of treatment moved first into his apartment over his office with her children and then to his farm, which was purchased in part by $14,000 which the doctor induced her to invest therein from her personal funds; that in the course of his treatment and therapy he demanded that she give him money received from her husband for support of the children, other sums of money, and crop money from her and her husband's farms, file spurious lawsuits against her husband and her brother, work as a hand in defendant's fields, take property from her husband's home under the doctor's directions to shoot anyone who got in her way and that she pay him $100 per month rent during all this time.

That as a part of his treatment, he had her attend social gatherings, skating parties, taverns and livestock sales with him and take trips with him outside the state, went with her to her husband's farm to get property, urged her to invest her money in his (the doctor's) enterprises, induced her to transfer her affections from her family and friends to him, failed to shun association with her after he knew she was in love with him, aroused her emotionally and convinced her that without him she and her children would starve and she would be committed to a state hospital if she went back to her husband or brother.

That by his treatment and counselling the doctor was guilty of professional negligence, by reason whereof she suffered remorse, humiliation, mental anguish, loss of respect of friends and family, was made nervous and unable to sleep, suffered head-

---

1. "What is perhaps regarded as the most significant concept in psychoanalytical therapy, and one of the most important discoveries of Freud, is the emotional reaction of the patient toward the analyst known as the *transference* * * *", Modern Clinical Psychiatry, Noyes & Kolb, 6th Ed., 1963, p. 505. "Inappropriate emotions, both hostile and loving, directed toward the physician are recognized by the psychiatrist as constituting a special aspect of the patient's neurosis—the transference. The psychiatrist looks for manifestations of the transference, and is prepared to handle it as it develops." Melvin S. Heller, M.D., Some Comments to Lawyers on the Practice of Psychiatry, 30 Temple University Law Quarterly 401, 402.
"[T]ransference * * * In psychiatry, the shifting of an affect from one person to another * * * especially the transfer by the patient to the analyst of emotional tones, either of affection or of hostility * * *." Dorland's Illustrated Medical Dictionary, 23rd Ed., 1957, p. 1454.
" * * * Transference may be *positive*, when the feelings and reactions are affectionate, friendly, or loving. * * * Understanding of transference forms a basic part of the psychoanalytic technique." Blakiston's New Gould Medical Dictionary, 2nd Ed., 1956, p. 1260.

aches, was irritable and suffered financially.

■ [It will be noted that mistreatment of the transference phenomenon and other mistreatment are the main base of complaints. As an insurer of psychiatrists, the defendant would know, or in the exercise of reasonable care in the operation of its business should know, that transference pertains to psychiatry and is important in treatment.[2] In addition, the petition is explicit as to the various harmful and damaging results allegedly flowing from the mishandling of the transference phenomenon under the guise of treatment.]

Appellant's position, set forth in its reply to respondent's denial of answers to interrogatories, is in essence " * * * that whether or not plaintiff fell in love with the said Freeman when she was relatively free of headaches and diarrhea, and whether she engaged in social and business contacts with the said Freeman, and sued people, and moved from her husband's home, concerns matters extraneous to being treated by a medical doctor, and matters extraneous to receiving professional treatment * * * "; and that defendant's " * * * contracts entered into with defendant Freeman concern professional services rendered as a physician * * * [and] do not cover causing a woman to move out of her husband's home, sue people or making love * * * [or] the activities of two people, whether one is or is not a professional man and a physician, with respect to the relationship of male and female in any amorous capacity * * *."

Both sides moved for summary judgment. Attached to appellant's motion was a partial transcript of the original trial here filed by stipulation as an exhibit. The trial court held appellant liable under its three $5,000 policies for $15,000 and interest, a total of $18,025.47.

The facts contained in the partial transcript of the original case are these:

Respondent Ada Margaret Zipkin prior to April 1959, lived on a farm west of Columbia, Missouri for twelve years, as the wife of L. D. Baurichter. They had three children. She was active in community affairs such as PTA, the farm club, and in church. She and her husband entertained neighbors and friends, attended sports events, and one year were selected as the outstanding farm couple. About two years prior to April 1959, Mrs. Zipkin developed a chronic diarrhea, and about two months prior to that date she began to have severe headaches. Her regular doctor, Dr. Charles Lampke, treated her for these conditions but was not able to alleviate them, and, after many tests to try to find the causes, suggested she needed a psychiatrist and mentioned Dr. Freeman, of Columbia. She decided to see Dr. Freeman, made an appointment, took preliminary tests and saw him on April 18, 1959. There was a general discussion of what Dr. Lampke had reported to Dr. Freeman and he "asked me questions about my home and my family." She told him she had a good home, a good husband and thought she was very happy. During the first months the treatment "was limited to conversations, general talking. Most of all he asked me about my husband, if I was sure that he really loved me and that we were as happy as we thought we were."

After about two months of treatment the conditions for which Mrs. Zipkin went to

---

2. In A Primer for Psychotherapists, Kenneth Colby, M.D. (1951) says, pp. 113–14, "Once a transference is recognized, the therapist makes use of it in two ways. First by evaluating what transference role the patient is forming, the therapist gains understanding of what is being relived and re-experienced rather than being remembered * * *.
" * * *
"The second use made by the therapist of a transference is *in regulating the future course of therapy * * *"* (emphasis supplied).

Dr. Freeman "were completely gone".[3] She asked him if it was necessary that she stay in treatment, which cost $17.50 per hour, two treatments a week. Dr. Freeman told her she could leave if she wanted to, but that her symptoms would return, she would have diarrhea and headaches again, and that it would probably be better if she stayed until they got to the root of what was really the problem, so she continued treatment.

During this time, Dr. Freeman did not talk to Mrs. Zipkin about the phenomenon of transference, her feelings toward her family, and what would happen during treatment, but she gradually began to see that "I absolutely felt nothing for my husband or my family. All the feelings that I had were for the doctor." Dr. Freeman told her that she would probably start remembering her dreams, and to take careful note as to what she had dreamed because "these were help in getting to my trouble and he would help me to analyze them." About the dreams, Dr. Freeman began to tell her that "it was obvious that I was so much better than my husband, and I was searching for a strong man in my life and that he was that man."

In agreeing to continue the treatments after the headaches and diarrhea ceased, Mrs. Zipkin testified she was following Dr. Freeman's advice as to what she needed to correct her condition permanently. By this time "I had begun to feel nothing for my family or my husband * * * thought I was in love with the doctor." He told her "* * * this was what I needed to get completely well, that this is what I would do" and she followed his directions in detail. She told Dr. Freeman she loved him and he told her he loved her too, this being three or four months after she started treatment.

In the summer of 1959, Dr. Freeman invited Mrs. Zipkin into his home, "saying that this was group therapy." She went to parties there, and a swimming party,[4] and once a week Dr. Freeman had skating parties attended by eight to ten patients and their spouses. The social activities around Columbia continued through the winter, and she took a trip to New Orleans with Dr. Freeman and Mrs. Freeman and about a dozen other persons, including patients, in the early months of 1960. Dr. Freeman told her the occasion of the trip was a vacation, "and at times he would take some of his patients along for this group therapy, or because, maybe, sometimes the patients felt lost when they were not close to the doctor, and this was one way to treat them."[5]

At a date not shown, she made an overnight trip with Dr. Freeman and a married couple, also his patients, to Lawrence, Kansas to visit a nursing home there, because there had been some talk of the doctor's

3. According to Dr. Heller, in the article cited in note 1, supra, l.c. 405, 406, "* * * The patient is called upon to discuss in a candid and frank manner personal material of the most intimate and disturbing nature. He did not, after all, come into therapy to find out what a fine fellow he is. He is expected to bring up all manner of socially unacceptable instincts and urges, immature wishes, perverse sexual thoughts—in short, the unspeakable, the unthinkable, the repressed. To speak of such things to another human requires an atmosphere of unusual trust, confidence and tolerance * * *."
"* * * *
"Patients will be helped only if they can form a trusting relationship with the psychiatrist * * *."

4. One swimming party was at a quarry with a number of people, including patients and spouses. Those in the water, including the doctor, were in the nude. Mrs. Zipkin testified she had a fear of water and did not go in.

5. "A major goal, especially in the early stage of psychotherapy, is to build a relationship in which the patient comes to trust the doctor as a reliable object. In this context object constancy will replace inconstancy, and the patient will be able to span intervals between actual contacts with his needed objects without being so vulnerable to separation anxiety * * *", Burnham, Separation Anxiety, 13 Archives of General Psychiatry, 346, 356, October 1965.

starting a nursing home in Columbia. Dr. Freeman told her the trip was both social and group therapy, "Because at this time a lot of patients would say things * * * in other words, would lose a few of their inhibitions, maybe, and you could therefore study a patient closer."

About four or five months after she began treatment, Mrs. Zipkin gave up her active part in PTA, church and club activities, community affairs and visits with friends and neighbors because "They no longer had any interest for me * * * they meant nothing to me", the same being true as to her family and husband.

During the above time Dr. Freeman asked about Mrs. Zipkin's inheritance of an estate, and said "he would advise me as to how to handle it and I would thereby be a rich woman." He told her he was making $50,000 a year and a farm would be good for him for tax purposes. He also convinced her that her own home was not good enough for her. Mrs. Zipkin and her then husband (Baurichter) knew she was pregnant and expecting twins and had discussed the fact that the house on their own farm would be too small for the enlarged family and had been discussing arrangements to enlarge the house. They began looking at farms, first Mrs. Zipkin and her husband along with Dr. Freeman and his wife; later just Dr. Freeman and Mrs. Zipkin. They discussed buying 190 acres, and Mrs. Zipkin discussed it with her husband and her family attorney, who advised her against going in with the doctor and that perhaps she and her husband should buy the farm. Her husband said that he wanted no part of it. Soon after that she left him, moved at the doctor's suggestion to his apartment over his office with her three children and invested what money she could get from the estate in the farm, $14,000, which was later paid back by the doctor with interest, under threat of foreclosure. After a month in the apartment, she and

the children (including the twins) moved to the farm, known as "Roads End", in the first part of June 1960, upon the understanding she would pay $100 per month rent.

As to Mrs. Zipkin's subconscious problems, Dr. Freeman told her she had a character disorder; she had a desire to be a male; that she thought she had to compete with males in order to be anything; that she did not know what it was to be a woman; and that she had a religious problem and a deep-seated rebellion and hostility toward her family. The basic diagnosis was that she was a neurotic, and had "an inferiority complex".

While she was at the farm and in his office, Dr. Freeman discussed with Mrs. Zipkin how she could rid herself of the subconscious desire to be a man. He often referred to her in the male role. She worked just as the men worked. She sawed wood; helped to build fences; took care of the sheep when they were lambing and were being sheared; she drove a truck when they picked up hay, drove a tractor and disced the land, and made the garden. When they would go out for the farm labor, Dr. Freeman would say, " 'Come on, men,' including me, and that this was what I needed to discover that I did not want to be a man, that I really desired to be a woman." The farm work brought on a constant backache, which has continued.

Dr. Freeman told Mrs. Zipkin to divorce her husband, "that I must do that in order to get completely well." [6] She did file suit in June 1960, but the divorce was denied. She also filed an accounting suit against her husband, which suit was eventually dropped. She filed a suit against her brother for estate money he was supposed to have taken and which rightfully belonged to her, and the suit was dismissed. Dr. Freeman advised her on all these procedures, and explained to her that it was

6. One lawyer she consulted told her that if she would "leave the doctor and his presence" he would consider handling her case, but when she told the doctor this, he told her, "No, you cannot leave my presence * * *."

one way to rid herself of the pent-up hostility that was in her toward her family. This was why she filed the lawsuits, not to win them. For that same purpose, as part of his treatment and counselling, Dr. Freeman told her to go back to her former home. She went there alone, broke in, and took a few small things, "just to get some of this hostility out of me." He went with her on a later occasion and they took a desk, and some beds which went into his home for his two boys. She was told by him to take some of the livestock which her husband had, but she was unsuccessful, and he directed her to return with a pistol he gave her and to shoot anyone who got in the way and to take anything she might want. He told her "this was a war of hostility at that time between my family and myself and that I was on the front line and I had to take care of myself." She returned, but her husband was not at home. She picked up a television set and a radio and returned to Roads End. She had, while at her husband's, discovered he had bought several new suits of clothes. When she so informed Dr. Freeman, he told her he needed some suits and for her to go back and get them, which she did. At his request she replaced the labels on the suits with some from his old ones. He also told her to go to her brother's office in Columbia as part of the venting of her hostility and search through his desk for evidence of cheating her. She went through her brother's desk, while the doctor stood watch at the office door.

She admitted giving conflicting false testimony in her divorce hearing, on deposition, and at a hearing involving Dr. Freeman before the Board of Healing Arts, and testified that she was directed by Dr. Freeman to testify as she did. She also testified she had sexual relationships with him and had been his mistress.

The social trips and associations stopped in November 1961 and Mrs. Zipkin left Roads End in March 1962. As to what would happen to Mrs. Zipkin if she left Roads End and Dr. Freeman's company, he told her "that if I should ever leave him and to go back to my husband or to my brother that they would probably have me committed to an insane asylum. * * *"

Mrs. Zipkin could not recall any direction or demand that Dr. Freeman gave to her that she did not attempt to do; "I did exactly as he told me to do, because he told me that this was what I needed and should be doing in order to overcome my illness." She testified she loved the doctor, put her faith and trust in him and did or said anything he told her was good treatment for her; that he told her all he had her do was for the purpose of ridding her of her character disorder and the other things she needed to be cured of. She testified further he did not at any time attempt to withdraw himself as the object of her affections.

She still has headaches, nights of not sleeping; she is irritable with the children, distrustful of her family and her present husband (Zipkin); she has no friends, she belongs to nothing; she rejects people if they make an attempt to come around her; she is moody and she has tremendous guilt feelings of what she has done to her family, the humiliation that she brought to them and herself.

Dr. Thomas E. Flynn, a physician specializing in psychiatry, examined Mrs. Zipkin and testified on her behalf in the damage suit. At the time of trial, Dr. Flynn saw Mrs. Zipkin as a very frightened person who probably should be seeing a psychiatrist, afraid to see one, and has since 1959 to 1962 alienated most of her friends in Columbia, Missouri, being more or less isolated. The group therapy would tend to isolate such group from the community, but Mrs. Zipkin's condition was more of a product of what went on in her in the relationship that she had with Dr. Freeman. As to why Mrs. Zipkin would make conflicting stories under oath, it was Dr. Flynn's opinion that she found in Dr. Freeman acceptance that she had never before found in anyone else, she became more

and more dependent upon him, and she would do anything she could to keep anyone from harming him because he was, at that time, her sole existence, she was living through him. As to doing overt acts against her husband to rid herself of hostility, one never encourages the patient to act out any real physically aggressive impulses toward another person—it would tend to make it worse. To take the situation of Mrs. Zipkin being in love with Dr. Freeman, and he with her, outside the office relation of doctor-patient into social relationships, would allow the patient to develop all sorts of unusual ideas around the feelings she has about the doctor. None of the things described in evidence which took place outside the office is proper treatment for neurosis. Dr. Flynn could see nothing wrong with Mrs. Zipkin's playing the role of a man on the farm, but he would not advise either way. On cross-examination, Dr. Flynn said in his examination of plaintiff he tried to find out what sort of treatment she received and its effect on her, that initially there was "terrific improvement" and then "into a kind of wild and weird therapy that left her just angry, frustrated, scared, almost an idiotic person." He also stated that just because the diarrhea and headaches had disappeared did not mean that treatment should cease, that the underlying causes would still be in existence and would require further treatment.

Dr. Flynn testified that the type of swimming parties where a number were not dressed is not group therapy, although this is an accepted type of psychiatric treatment where patients come to see the psychiatrist as a group and discuss their problems together; the type of skating parties described in evidence is not group therapy; the taking of trips, some overnight, by another couple, Mrs. Zipkin and Dr. Freeman, where he stated he could perform therapeutic treatments, is not accepted treatment—one would be entering into a social relationship with patients and Dr. Flynn could not see how it would have anything at all to do with therapy. He considered it improper treatment.

The following hypothetical question was asked Dr. Flynn: assuming that Mrs. Zipkin placed herself in charge of Dr. Freeman for the purpose of treatment of headaches and diarrhea, and that he, while treating and counselling her, caused her to transfer love and affection for others to him; that in a few months her ailments ceased to exist and that the relationship became more than one of patient-physician and reached the point where her feelings of love were no more simply transferred feelings of love for the doctor as a physician but direct feelings of love by her for Dr. Freeman as a person; that he continued treatment and therapy and counselled her to engage in social and business contact with him; to take trips with him; to file unproved lawsuits; to take her husband's property and give it to him, all pursuant to his counsel and encouragement and upon his representation to her that they were necessary and proper professional care and treatment of her; and that he failed to attempt to remove from her feelings of love for him, to withdraw as the object of her love, then whether, based upon reasonable medical certainty, like physicians in good standing in similar communities engaged in similar practice, under similar conditions, would have continued such social and business contacts and exercised continued treatment in treating the plaintiff? It was Dr. Flynn's opinion "That was not proper treatment", that Mrs. Zipkin's condition was directly caused by the continued social and business contacts, treatment, counselling and therapy of Dr. Freeman, and her condition is probably permanent; that the psychiatrist should not enter into social relationships with the patient if he wants her to improve; that the transference phenomenon is why treatment should be handled in the office; that the creation of a social relationship completely distorts the transference situation and the doctor should not enter into a social relationship with the patient; that there "must have been horrible things going on with her during this period."

It is our opinion and we hold that the defendant insurer was obligated to defend this case and is liable under its policy. It refused to defend on the ground that the acts and omissions of Dr. Freeman were not professional services rendered by him in the practice of his profession. It makes no claim that part of what Dr. Freeman did is covered and part is not. It contends that none of what gave rise to plaintiff's claim were professional services covered by the policy, that these "were things any butcher, baker, beggar man or thief was capable of doing". It quotes the testimony of Dr. Flynn that the swimming parties and skating parties were not therapy and had the effect of distorting "the entire transference situation" and turning the patient-physician relationship into a social relationship. Parenthetically, we observe that the context of Dr. Flynn's testimony is more that these were not proper therapy or properly handled than that they were completely unrelated to therapy.

At any rate, defendant argues that by no stretch of the imagination can any of what the doctor did be considered professional services, that there was no way they could have litigated this aspect of the matter in the Zipkin v. Freeman case and hence it was under no duty to defend and is now under no duty to pay.

However, it is an oversimplification to focus on the more spectacular and extreme acts of the doctor as determinative of the issue. Under the extremely broad terms of the policy before us, defendant agreed to pay damages "based on"—which would also mean resulting from, or caused by, or due to—professional services rendered or which should have been rendered. The word "damages" is not limited to any particular kind of damage or injury and applies to any claim or suit, with certain specific exceptions not here material. Defendant would limit the damages to the very act itself of professional services, but the policy clearly covers the results and liability flowing from professional services rendered or which should have been rendered.

The gravamen of the petition is that defendant did not treat Mrs. Zipkin properly and as a result she was injured. He mishandled the transference phenomenon, which is a reaction the psychiatrists anticipate and which must be handled properly. He mishandled it over a long period of time. As Dr. Flynn explained, to take the relationship outside the office into social relationships, "would allow the patient to develop all sorts of unusual ideas just around the feelings that she has about the doctor", and that a psychiatrist should no more take an overnight trip with a patient than shoot her; that "Patients have enough trouble with their feelings that they develop about the doctor without adding to them by actual events." He said transference should be handled in the office situation. He concluded that the treatment she received initially resulted in "terrific improvement", but that Dr. Freeman then launched "into a kind of wild and weird therapy that left her just angry, frustrated, scared, almost an idiotic person" (no doubt the jury, as well as the reader, could well believe that Mrs. Zipkin would have had to be on the verge of idiocy to do some of the things demanded of her). It is evident Dr. Flynn was aghast at what Dr. Freeman had done in the way of therapy (there "must have been horrible things going on with her during this period"), but he had no doubt this was the cause of Mrs. Zipkin's condition.

Once Dr. Freeman started to mishandle the transference phenomenon, with which he was plainly charged in the petition and which is overwhelmingly shown in the evidence, it was inevitable that trouble was ahead. It is pretty clear from the medical evidence that the damage would have been done to Mrs. Zipkin even if the trips outside the state were carefully chaperoned, the swimming done with suits on, and if there had been ballroom dancing instead of sexual relations. It might not have been exactly clear at the beginning of the failure to treat properly how the trouble would manifest itself, but under the petition and the evidence Dr. Freeman did not give Mrs.

Zipkin the professional services he should have. The damages which she sustained resulted from such failure and are within the policy coverage.

Kime v. Aetna Casualty & Surety Company, 66 Ohio App. 277, 33 N.E.2d 1008, is inapplicable, because what the optometrist was doing there—eye surgery—was not within what he was licensed by the state to do in the practice of optometry. In Crenshaw v. United States Fidelity & Guaranty Co. (Mo.App.), 193 S.W.2d 343, the doctor had two capacities—one as a private physician, the other as coroner. The court held his physician's liability policy was not intended to cover him in his capacity as a public official. In Finger v. United States (D.C.S.C.), 257 F.Supp. 312, the court refused to permit the doctor to deduct as a business expense the cost of defending a suit against him by a husband for loss of consortium of his wife, whom the doctor had injured and debauched. No question of professional services was involved.

Under the policy provisions before us, the problem is largely one of proximate cause. We see no sound reason why the degree of causation which need be alleged or proved is any different from that required in an ordinary negligence case. Viewed in that light the damages sustained by Mrs. Zipkin were directly and proximately connected with the professional services which Dr. Freeman rendered or failed to render.

While we are passing only on the question of whether the present claim is within the coverage provisions of defendant's policy, we note that the English Court of Appeal, in Landau v. Werner, 105 Solicitor's Journal 1008 (1961), has held a psychiatrist responsible for the consequences of mishandling the transference phenomenon. There the patient was an intelligent, middle-aged woman in an anxiety state. The psychiatrist gave her psychoanalytic treatment in his office. After four or five months the plaintiff was much better, but felt she had fallen in love with the doctor. The doctor explained this to her as being part of the process of transference. He felt a sudden withdrawal on his part might cause a relapse, so over the next seven or eight months he took her out to tea and dinner in restaurants on a number of occasions and visited her once in her bed-sitting room. There were also conversations about their spending a holiday together. By the end of this period plaintiff's condition had deteriorated. The doctor resumed formal treatment, but to no avail and the plaintiff became incapable of work. She recovered a judgment of six thousand pounds in the trial court. In affirming the award and dismissing the appeal the appellate court said, " * * * Here the medical evidence was all one way in condemning social contacts and the doctor had failed to convince the judge that his departure from standard practice was justified and was a reasonable development in this young science. The judge was justified in his view that this unwise treatment had led to the grave deterioration in the plaintiff's health * *."

The conduct of the London doctor was more restrained but the same argument could be made there as attempted by defendant here—i. e., that taking a patient out to tea and dinner has nothing to do with professional services—but the English court had no difficulty in holding the doctor liable. The point there, as here, is that the damage to the plaintiff was the result of his mishandling of the transference phenomenon.

Defendant argues it would have been in an inconsistent position had it appeared in the damage suit and defended in Dr. Freeman's name, that its defense would have to be that what he did was not professional services and this would only serve to enhance the damage award likely to be returned by the jury; further that it would have no way to try the question of coverage or no coverage in the damage suit and so it is not bound by the outcome of the damage suit.

Defendant is not entitled to defend or deny coverage on this ground when there is evidence, as there was here, that the damage done to Mrs. Zipkin over the long period of time that the physician-patient relationship existed, resulted and was made possible only because there were professional services rendered during this time and others which should have been rendered but were not. Defendant could have litigated the issue in the damage suit of whether the resulting damage was directly and proximately caused by the professional services or lack of them. If the connection was too tenuous or if the particular acts of Dr. Freeman stressed by defendant were not relevant to any professional services of a psychiatrist, defendant could have raised the point by objecting to such evidence in the defense of the damage suit and keeping it away from the jury entirely. This defense would have been consistent with the mutual interests of Dr. Freeman and the insurer. However, this sort of defense needed to be presented in the trial court and defendant, of course, having elected not to defend, is in no position now to raise a matter which could have been raised there.

Defendant, also, of course, could have defended the damage suit on the ground Dr. Freeman did not mistreat Mrs. Zipkin, but it is apparent defendant is convinced Dr. Freeman was to blame. In its brief it says that the verdict and judgment against him were justified and that the award is modest. However, the fact that their insured proved to be a poor risk is one of the hazards the defendant must run and for which it collects a premium. If the results of what he did or failed to do in the way of professional services damaged the plaintiff, then it is bound by the resolution of this issue in the damage suit, which it could have participated in had it so desired.

Drennen v. Wren (Mo.App.), 416 S.W.2d 229, and Perkins v. Becker, 236 Mo.App. 786, 157 S.W.2d 550, cited by appellant, do not apply because in those cases the insurer actually had a policy defense which was not directly involved in the original action, whereas here the insurer was mistaken about having a policy defense.

The trial court was therefore correct in rendering summary judgment in favor of respondent.

Appellant says that by virtue of paragraph E of its policies (which provide coverage each year of $5,000 minimum and $15,000 maximum) it is, at the most, liable only for $5,000, not $15,000. Paragraph E of the policy is: "The Company's liability for damages shall not exceed the minimum amount herein stated in any one claim or suit and subject to the same limit for each claim or suit the Company's total liability, during one policy year, shall not exceed the maximum amount herein stated; such amount being in addition to the cost of the unlimited defense provided under paragraph B and the premium on any bond furnished under paragraph C."

Respondent argues that these separate and distinct policies create a total liability of $15,000 for the three separate coverage years in each of which Dr. Freeman's acts and omissions or professional services were rendered. Cited is Krey Packing Co. v. Employers' Liability Assur. Corp. (Mo. App.), 127 S.W.2d 780; Rice v. Provident Life and Accident Insurance Co., 231 Mo. App. 560, 102 S.W.2d 147; and Grand Lodge, U. B. of F., Etc. v. Massachusetts B. & Ins. Co., 324 Mo. 938, 25 S.W.2d 783. In the Krey case it was held that the original employees' bond policy, with yearly renewal certificates, created separate liability of $1,000 for the defalcations of employee Gones for each year, and the company was liable for $1,000 of the loss which happened in the first year and $750 for the second year embezzlement. In the Grand Lodge case it was held that by reason of a provision in the bond that liability in the aggregate should not exceed $20,000, there was no separate and cumulative liability (for $60,000) for the three years in which losses occurred. In the Rice case it was held that renewal of an accident and health policy, created a new and distinct contract for the period of time covered by such re-

newal, and on the same terms as those contained in the renewal policy. These cases turn upon their own facts and the provisions of the contracts of bond or insurance there involved. They are thus not helpful here.

■ The fallacy of respondent's argument is that Dr. Freeman's acts and omissions *continuously* occurred over the three-year period. His was a *continuing tort* for which respondent would have *one* claim (for all damages which had previously been occasioned her, and for all future damages) arising out of Dr. Freeman's wrongful acts. Compare Krug v. Sterling Drug, Inc., Mo., 416 S.W.2d 143, 149, holding that a cause of action for continuing negligence accrued upon cessation of the wrong (here in December 1961, when Mrs. Zipkin discontinued association with and treatment by Dr. Freeman). See also Hotelling v. Walther, 169 Or. 559, 130 P.2d 944, 144 A.L.R. 205. Respondent had only *one* claim for her injuries accruing to her over this two to three-year period. The rule is well settled that a party may not try his case piecemeal, i. e., Mrs. Zipkin could not at this time sue in separate actions for injuries occurring to her in each of the three years. Tooker v. Missouri Power & Light Co., 336 Mo. 592, 80 S.W.2d 691, 695, 101 A.L.R. 365; compare the continuing conspiracy case under the Sherman Anti-Trust Act, Engelhardt v. Bell & Howell Co. (C.A.Mo.), 327 F.2d 30; and see the language of Lee v. Guettler (Mo.Sup.), 391 S.W.2d 311, 313, relative to rules on splitting of causes of actions.

■ Clause E above of the policy is clearly worded that appellant's liability shall not exceed $5,000 *in any one claim or suit.* Respondent is a single claimant with only one claim for the damages which the insured, Dr. Freeman, inflicted upon her. Appellant is liable to respondent for only $5,000 plus interest from the date of her judgment against Dr. Freeman.

The case is remanded with directions that a new judgment be entered for respondent against appellant for $5,000 plus interest from the date of the original judgment for respondent against Dr. Robert F. Freeman. In all other respects the judgment is affirmed.

HOLMAN, C. J., and STORCKMAN, J., concur.

EAGER, J., concurs in result in separate concurring opinion filed.

FINCH and DONNELLY, JJ., concur in result and concur in separate concurring opinion of EAGER, J.

HENLEY, J., dissents.

EAGER, Judge (concurring in result).

In my opinion, many of the acts of Dr. Freeman did not constitute malpractice, nor did they have any true relationship with professional services performed or omitted. Some of them were willful, malicious acts, such as: sending the patient out to steal her husband's property; putting on swimming parties in the nude; taking from her by persuasion or otherwise, $14,000 of her money for the purchase of a farm for him (even though it may later have been paid back "under threat") and taking also other sums including her child support money; the promoting of an actual and acted out hostility between her and her husband; causing and directing her to give perjured testimony; and, finally, the carrying on of a notorious illicit intercourse with her over an extended period of time. Some of these acts probably constituted crimes.

Regardless of all psychiatric theories, whether of transference, withdrawal, or otherwise, this relationship (and the doctor's acts) passed the point at which anyone could logically believe that they had any reasonable connection with professional

services, or that they were being performed in the course of any legitimate treatment. In other words, the "treatment" ceased, and an ordinary, person-to-person, invasion of plaintiff's rights, civil or criminal or both, began. As an illustration of this, one of the expert witnesses said, according to the opinion: " * * * that a psychiatrist should no more take an overnight trip with a patient than shoot her"; and, so far as I am concerned, a similar conclusion may well be applied to many of the doctor's other acts.

Despite my view that much of this conduct played no part, affirmatively or negatively, in any professional relationship but was born of a vicious mind, there is no way in which the doctor's acts can be separated and classified by us in this case. They were all put into evidence in one lump in the original suit; the verdict-directing instruction covered substantially all of the defendant's acts; the verdict was thus founded upon all such acts, although the case was submitted under the *guise* of negligence. Incidentally, we note that one does not conduct an illicit adventure with a woman over a period of months through negligence, professional or otherwise.

No effort was made in the trial of the original action to separate the breaches of professional obligations from such other acts, either by objections to the evidence or by instructions; and, as the principal opinion points out, the insurer makes no claim here "that part of what Dr. Freeman did is covered and part is not." Under these circumstances, our hands are tied. However, so far as I am concerned, I do not want this Court to go on record as even inferring that all of the acts of this defendant arose out of or had any true connection with professional services, performed or omitted.

Under the circumstances, I concur in the result only.