**RCA MUTUAL INSURANCE COMPANY,**
a Corporation, Plaintiff–Respondent,

v.

**John SANBORN, Defendant–Appellant,**

**and**

**Gregory Henry, D.O., Defendant.**

**No. 19989.**

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 14, 1996.

Motion for Rehearing or Transfer
Denied March 7, 1996.

Application to Transfer Denied
April 23, 1996.

Glenn R. Gulick, Jr., Hershewe & Gulick, P.C., Joplin, for appellant.

Gregory W. Aleshire, Turner, Reid, Duncan, Loomer & Patton, P.C., Springfield, for respondent.

MONTGOMERY, Presiding Judge.

This appeal arises from a declaratory judgment action brought by RCA Mutual Insurance Company (RCA) against its insured, Dr. Gregory Henry (Dr. Henry), and John Sanborn (Sanborn), Dr. Henry's former patient.[1] Earlier, Sanborn had filed a malpractice suit on February 13, 1992, against Dr. Henry alleging negligent treatment and surgery on his right hip (the underlying action).

While the underlying action was pending Sanborn and RCA entered into a settlement agreement whereby RCA (1) paid Sanborn $200,000 for a release of Dr. Henry's liability to him, (2) agreed to litigate the instant declaratory judgment action to a conclusion for a determination of whether more than one $200,000 policy limit was owed to Sanborn, and (3) agreed to pay Sanborn an additional $200,000 if it was determined that coverage under two or more policies issued by RCA to Dr. Henry applied to Sanborn's claim.

The trial court determined that Sanborn was entitled to only the $200,000 previously paid by RCA. Sanborn appeals.

The facts are undisputed. For the purposes of the instant action, RCA admitted that the facts pleaded in Sanborn's original petition are true. Pertinent portions of that petition allege:

4. On or about February 2, 1988, John Sanborn presented himself at the office of Gregory Henry, D.O. for evaluation of right hip pain. Radiographs revealed arthritis in the right hip. Dr. Henry assumed the medical care and treatment of Plaintiff John Sanborn.

5. On or about June 23, 1988, Mr. Sanborn was admitted to Oak Hill Hospital and underwent a total replacement arthroplasty of the right hip, utilizing an AML femoral prosthesis and a 58 mm. acetabular component. Mr. Sanborn was discharged on or about July 5, 1988.

6. During an office visit with Gregory Henry, D.O. on or about February 14, 1989, an x-ray revealed an unstable hip with loosening and dislocation of the prosthesis, with the acetabular component rotated.

7. On or about February 24, 1989, John Sanborn underwent a revision surgery at Oak Hill Hospital. The ball of the prosthesis was removed and replaced. An x-ray taken on or about February 24 revealed that the cup of the acetabulum was more superiorly placed, and that the cup was slightly out of the upper portion of the acetabulum when compared with the x-ray taken on or about June 24, 1988.

8. On or about April 11, 1989, John Sanborn complained of right hip pain and right leg pain with swelling. Thereafter, Dr. Henry recommended an acetabular cup revision.

9. On or about August 12, 1990, John Sanborn was re-admitted to Oak Hill Hospital. X-rays taken at this time confirmed the presence of a dislocation/subluxation and showed further malposition of the acetabular component. On or about August 14, 1990 John Sanborn underwent another revision surgery where the AML ball was

---

1. RCA incorrectly views Sanborn's appeal as arising from a grant of a summary judgment. Although both of these parties filed motions for summary judgment, nothing in the record indicates that the court ruled on either one. The transcript of the October 28, 1994, hearing clearly shows that the trial court proceeded to hear the case on its merits. Although no live witnesses testified, the trial court received into evidence various medical records, deposition testimony, and Sanborn's original petition in the underlying action. The trial court's findings, conclusions, and judgment confirm our view of the action below. Based on this record we review this case as a court-tried matter.

removed, the hip was disarticulated, and the fractured polyethylene insert was removed. The acetabulum was debrided and the metal back portions of the cup were removed. A new cup was seated and fixed with three cancellous bone screw[s]. The hip was realigned. Post-operative x-rays revealed the prosthetic acetabulum was placed approximately four to five centimeters too high and was superiorly uncovered.

10. Radiographs taken on or about October 7, 1991 revealed malposition of the acetabular cup, which was also uncovered superiorly.

11. As a result of the malposition, Plaintiff John Sanborn has suffered a shortening of his right lower extremity and a permanent functional impairment and instability of the right hip and extremity.

12. Plaintiff John Sanborn was under the continuous care and treatment of Defendant Gregory Henry D.O. until September, 1991.

RCA does not deny that Dr. Henry was negligent in one or more respects in performing each of the three surgeries. In reaching the aforesaid settlement, the parties' main concern was whether one or more of Dr. Henry's four insurance policies with RCA, covering the time period from February 1988 to September 1991, were applicable to Sanborn's claim.

The four policies were issued from RCA to Dr. Henry beginning on July 1, 1987, to July 1, 1988, and for the same time period in each of the next three years. Each policy contained a different policy number, and each was found by the trial court to be "a renewal and continuation of a preceding policy."

Dr. Henry's policies provide that RCA will pay on his behalf all sums which he "shall be legally obligated to pay as damages because of injury to which this insurance applies caused by a medical incident."[2] The policies

define "medical incident" as meaning "any act or omission ... in the furnishing of ... professional services" by Dr. Henry and concludes the definition with this paragraph:

> Any such act or omission together with all related acts or omissions in the furnishing of such services to any one person shall be considered *one* medical incident.

The policies contain a limit of $200,000 for each "medical incident" with an annual aggregate of $600,000.

RCA's petition in this case sets forth most of the above-mentioned facts, including an allegation that Sanborn was under the continuous care and treatment of Dr. Henry from February 2, 1988, until September 1991. The petition further alleged that (1) Sanborn's claim constituted one "medical incident," and he was only entitled to the one policy limit of $200,000 previously paid, (2) contrary to paragraph 12 of Sanborn's petition, he now claims his three surgeries constitute three separate and distinct torts entitling him to three $200,000 policy limits, and (3) if each surgery is found to be a separate tort, then any claims by Sanborn arising before his last surgery are barred by the two-year statute of limitation, § 516.105, RSMo 1986.[3] RCA prayed for a determination of the parties' rights under the four policies and for findings consistent with the allegations of the petition.

The trial court entered findings of fact and conclusions of law along with the following judgment:

> NOW, THEREFORE, the Court hereby orders and decrees (a) that the acts or omissions by Dr. Henry at the time of the initial surgery performed on Sanborn on June 23, 1988 and the revision surgeries thereafter performed on February 24, 1989 and August 14, 1990 constitute "Separate medical incidents" under the provisions of Dr. Henry's liability policies. (b) that even

---

2. Beginning with Dr. Henry's policies issued on July 1, 1989, through July 1, 1991, this provision was slightly changed from the earlier policies to read as follows: RCA agreed to pay "[a]ll sums which the insured shall be legally obligated to pay as damages because of injury arising out of the rendering of, or failure to render, professional services...."

3. The pertinent provisions of § 516.105 provide that "[a]ll actions against physicians ... for damages for ... negligence ... related to health care shall be brought within two years from the date of occurrence of the act of neglect complained of...."

though this Court did find that each of the three surgical procedures performed by Dr. Henry constitutes a separate tort, that any claims by Sanborn for the surgical procedure on June 23, 1988, was barred by the Statute of Limitations under § 516.105 R.S.Mo. (1976) on June 23, 1990; and that the revision surgery performed on February 24, 1989 was barred by the applicable two-year Statute of Limitations on February 24, 1991; and further that in that event, Sanborn's recovery would be limited to the $200,000.00 which has already been paid by RCA to Sanborn.

Sanborn's lone point relied on alleges that the trial court erred in determining his first two surgeries were time-barred because the statute was tolled by Dr. Henry's continuous treatment of his right hip. Sanborn alleges that each of his three surgeries were negligently performed, "the first for total hip replacement; the second included replacement of the femoral component and replacement/repositioning of the acetabular component; and the third involved relocation of the acetabular cup and replacement with a different type of fixation for the cup."

 The standard of review for this court-tried case is set forth in *Continental Casualty Co. v. Medical Protective Co.*, 859 S.W.2d 789 (Mo.App.1993). "The trial court's decision will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Id.* at 791. Here, the trial court erroneously declared that Sanborn's claim regarding his first two surgeries was time-barred because the running of the two-year period of limitation was tolled by reason of Sanborn's continued treatment by Dr. Henry.

This exception to the running of § 516.105 was first declared by the Missouri Supreme Court in *Thatcher v. De Tar*, 351 Mo. 603, 173 S.W.2d 760 (1943).[4] The *Thatcher* rule is discussed and well analyzed in *Shaw v.*

*Clough*, 597 S.W.2d 212 (Mo.App.1980). *Shaw* dictates the result reached here because the facts are essentially identical in each case.

In *Shaw*, the defendant performed corrective cervical surgery on plaintiff on March 13, 1975. During the surgery defendant obtained bone plugs for cervical fusion from plaintiff's anterior right thigh and, in doing so, entrapped plaintiff's lateral femoral cutaneous nerve. After plaintiff complained of leg pain, defendant performed surgery on him on August 25, 1975, to correct the nerve problem. Suit was filed on April 20, 1977.

The trial court sustained defendant's motion for summary judgment finding that plaintiff's claim was time-barred under § 516.105. On appeal, the appellate court reversed and remanded the cause for trial because the statute did not commence running until defendant's treatment of plaintiff had terminated.

In rejecting an argument that plaintiff failed to plead specific negligent acts of defendant after the first surgery, the *Shaw* court noted that one of plaintiff's interrogatory answers asserted that defendant was careless and negligent, "[b]y negligent entrapment of the lateral femoral cutaneous nerve during surgery on 3–12–75 and negligent attempted repair on 8–25–1975 resulting in permanent disability to right leg." *Id.* at 216. Considering these facts the court said that "the tolling rule of *Thatcher* applies and this cause of action was not barred by the two-year statute of limitation." *Id.*

The only difference between Shaw's and Sanborn's medical treatment is a third negligently performed surgery. Sanborn alleged that his second and third right hip surgeries were negligently performed revisions of his negligently performed first right hip surgery. Therefore, the two-year statute of limitation did not commence to run until Dr. Henry's treatment terminated in September 1991. Sanborn filed suit within two years of the

---

4. *Thatcher* holds that the "statute does not commence running until treatment by the physician or surgeon has terminated, where the treatment is continuing and of such nature as to charge the medical man with the duty of continuing care and treatment which is essential to recovery until the relation ceases." 173 S.W.2d at 762.

latter date and, therefore, his suit was timely filed under the *Thatcher* rule.

█ Even though the trial court erroneously failed to follow the *Thatcher* rule, reversal is not automatic. On appeal from a court-tried case, the appellate court is concerned with the correctness of the result, not with the route taken to reach that result. *Reinecke v. Kleinheider*, 804 S.W.2d 838, 841 (Mo.App.1991). However, that rule is tempered by the judgment being "correct upon any legal theory consistent with the pleadings." *Cottonhill Investment Co. v. Boatmen's Nat'l Bank of Cape Girardeau*, 887 S.W.2d 742, 743 (Mo.App.1994) (quoting *Morris v. Western Casualty and Surety Co.*, 421 S.W.2d 19, 21 (Mo.App.1967)). The trial court's authority is limited to the questions presented by the parties in their pleadings. *Id.*

█ The trial court reached the right result in this case consistent with RCA's pleaded theory that Sanborn was continuously treated by Dr. Henry and only one policy limit of $200,000 applied to Sanborn's claim.[5] We agree with the result below because Sanborn correctly urges that the *Thatcher* rule applies to his case. However, application of that rule comes with a burdensome consequence to Sanborn, i.e., his treatment must be considered as a "whole" until it ceases and his continuing treatment cannot be conceptually fragmented as he seeks to do.[6]

*Shaw* explains this rationale from the *Thatcher* rule as follows:

> The doctor-patient relationship is in most instances a highly personal and close one, encompassing on the part of the patient a basic confidence and reliance upon the skills and judgment of the doctor with a reasonable expectation that such will be met by a deep sense of obligation and proper exercise by the doctor of his incomparable superior knowledge and the dedicated use of his best talents and judgment.

597 S.W.2d at 215. It is the termination of this relationship that commences the running of the statute of limitation. Continuing, the *Shaw* court said:

> The rationale of the decisions in *Thatcher* and other jurisdictions adopting this exception are based upon the concept that it stems primarily from the nature of the relationship and that the obligation and treatment be considered as a "whole" until it ceases and the obligations arising therefrom should not be conceptually fragmented.

*Id.* at 215–16.

Sanborn runs afoul of the *Thatcher* rule rationale when he suggests that each surgery is a separate negligent act entitling him to more than one policy limit. Like the pleader in *Shaw*, Sanborn must view his claim from the standpoint of the "entire history of [his] care, treatment and surgeries as a 'whole', as comprehended by the *Thatcher* rule." *Id.* at 216. Sanborn cannot view his "whole" claim in fragments and at the same time avoid the application of the statute of limitation.

When Sanborn filed suit on February 13, 1992, the statute of limitation had run on his negligently performed first and second surgeries absent the application of the *Thatcher* rule. The rule applies only because Dr. Henry continued to treat Sanborn for "the injury caused by the act of neglect." *Lorsbach v. Plastic Surgery Consultants*, 745 S.W.2d 220, 221 (Mo.App.1987).

---

**5.** RCA argues here for the result we reach by stating that "Sanborn attempted to split Dr. Henry's care into separate and distinct parts in an effort to recover more than the single $200,000 liability limit, after alleging in his underlying action petition that he was under the 'continuous care' of Dr. Henry when Dr. Henry performed the surgeries on his right hip." As a non-appealing party, RCA "may nevertheless defend the favorable judgment with any argument that is supported by the record whether ignored by the trial court or simply rejected." *McKnight v. Midwest Eye Institute of Kansas City*, 799 S.W.2d 909, 919 (Mo.App.1990).

**6.** Sanborn's novel argument of continuing treatment but separate torts is akin to the situation where a party voluntarily accepts the benefits of a judgment and afterwards prosecutes an appeal to reverse it. Those actions are inconsistent. *In re Marriage of Vinson*, 839 S.W.2d 38, 40 (Mo.App.1992). A person who accepts the benefits of a judgment is estopped to deny its validity or any of its burdensome consequences. *In re Estate of Tapp*, 569 S.W.2d 281, 285 (Mo.App.1978).

When the treatment of Sanborn terminated, the *Thatcher* rule allowed him to recover all the damages he sustained resulting from the "whole" care and treatment rendered to him by Dr. Henry. Even Sanborn's attorney at trial viewed the damages as a "whole" when he admitted "we couldn't separate out the damages of the various negligent acts that occurred at any one of the surgeries."

The policy in force when Sanborn's treatment terminated required RCA to pay all sums Dr. Henry was legally obligated to pay as damages arising out of the rendering of professional services. According to *Shaw,* Dr. Henry's obligations to Sanborn when treatment ended cannot be fragmented. Those obligations include payment of damages for a "whole" claim. Thus, when his treatment terminated, Sanborn had only one "whole" claim for damages arising from Dr. Henry's services. The policy limited those damages to $200,000, the amount the trial court found that RCA had already paid Sanborn.

This result is consistent with the holding of *Zipkin v. Freeman,* 436 S.W.2d 753 (Mo. banc 1968). There, plaintiff had obtained a $17,000 judgment against Dr. Freeman, her psychiatrist, for negligent treatment provided to her over a three-year period. Plaintiff filed a garnishment action against the doctor's insurer seeking to obtain more than his $5,000 per claim liability limit in three separate policies for each of the three years of her treatment. The supreme court decided that plaintiff had only one claim for the damages which Dr. Freeman inflicted upon her. Thus, the insurer was liable for only $5,000 because Clause E of its policy was clearly worded that the insurer's liability shall not exceed $5,000 *in any one claim or suit.*

In reaching this decision, the court stated: Dr. Freeman's acts and omissions *continuously* occurred over the three-year period. His was a *continuing tort* for which respondent would have *one* claim (for all damages which had previously been occasioned her, and for all future damages) arising out of Dr. Freeman's wrongful acts.... Respondent had only *one* claim for her injuries accruing to her over this two to three-year period. The rule is well settled that a party may not try his case piecemeal, i.e., Mrs. Zipkin could not at this time sue in separate actions for injuries occurring to her in each of the three years.

*Id.* at 764 (citations omitted).

Sanborn, like the plaintiff in *Zipkin,* had only one "whole" claim (for all his past and future damages) when he filed his underlying action. The policy in effect when treatment terminated limited RCA's liability to the amount which had already been paid to Sanborn.

The judgment is affirmed.

GARRISON and BARNEY, JJ., concur.