**VIGILANT INSURANCE COMPANY, Plaintiff,**

v.

**EMPLOYERS INSURANCE OF WAUSAU, Defendant.**

**No. 84 Civ. 2956 (LLS).**

United States District Court, S.D. New York.

Jan. 10, 1986.

Kissam & Halpin, New York City, for plaintiff; Leslie Trager, Gary R. Greenman, of counsel.

Schiavetti, Begos & Nicholson, New York City, for defendant; Ralph Attanasio, Richard Nicholson, of counsel.

## OPINION

STANTON, District Judge.

This is a suit by one insurance company, Vigilant Insurance Company ("Vigilant") against another, Employers Insurance Company of Wausau ("Employers") to obtain contribution towards amounts paid by Vigilant to settle two lawsuits brought by former patients against Dr. Leonard ("Leonard"), whom each company insured at successive times for the same malpractice risks.

## BACKGROUND

Leonard was a psychiatrist practicing in New York. In August through November 1977, Leonard was a defendant in separate suits for malpractice, brought by Patricia O'Rourke Osborne ("Osborne") and Ellen Posmantier ("Posmantier"), each of whom complained, through the same counsel, that he had engaged in sexual activities with her while treating her professionally.[1]

---

**1.** An adverse judgment in a third suit by another former patient, Rhea Breitbard, was paid by

Employers was Leonard's malpractice carrier from January 1, 1970 through June 30, 1973; Vigilant was his carrier from July 1, 1973 to May 1, 1978. Each policy, in relevant part, provided essentially identical coverage. Vigilant's policy covered

"[i]njury arising out of the rendering of or failure to render, professional services by the individual insured, ... performed in the practice of the individual insured's profession ..."

Similarly, Employer's policy covered

"injury or death resulting from rendering or failing to render, ... professional services by the insured, ... performed in the practice of the insured's profession ..."

In keeping with the well-understood rule that the duty to defend is broader than the duty to indemnify, Vigilant and Employers equally shared the cost of defending the actions against Leonard and provided Leonard with the services of a seasoned trial lawyer, George Kehayas, Esq. ("Kehayas"). Regarding the duty to indemnify, however, Employers informed Vigilant and Leonard on February 6, 1978 that it would not indemnify Leonard for his sexual conduct with Osborne and Posmantier; Employers adhered to that position throughout.

After reviewing Osborne's deposition and determining that it identified no sexual acts as occurring within its policy period, Vigilant informed Employers on April 30, 1982 that it would no longer defend or indemnify Leonard in the *Osborne* case. Despite this disclaimer, however, Vigilant did continue to share with Employers the cost for Leonard's defense of the action. On November 3, 1982, after being informed by Kehayas that Osborne's trial testimony did implicate Vigilant's policy period, Vigilant withdrew its disclaimer (see below).

The *Osborne* case came to trial first, with three significant developments described below: the evidence came in very badly for Leonard, Osborne testified to sex-

ual contact with Leonard during the Vigilant policy period (thus bringing Vigilant back into the case) and Leonard proved to be of so little assistance to his own defense that Employers was ultimately provoked into disclaiming coverage because of his alleged noncooperation.

Because Leonard had taken the position (although he did not testify at her trial) that he had no sexual contact with Osborne, the trial judge allowed evidence of his acts with other patients, since the jury might from that evidence conclude he had acted similarly with Osborne. Such material was damaging enough to the defense, but there was worse: one witness testified that Leonard had made sexual advances towards her when she was 14 years old. Kehayas concluded, with good reason, that the effect upon the jury was such that a punitively large verdict could be expected.

Osborne testified, for the first time, to an act of sexual intercourse between herself and Leonard occurring after July 1, 1973, during the Vigilant policy period. Apparently she was convincing about both the act and its date, relating it to the "primal therapy" during which it took place. When this testimony was reported to Vigilant, Vigilant revoked its previous disclaimer of coverage and advised Kehayas that Vigilant was rejoining the defense of the case.

Meanwhile, Leonard was proving a difficult client. He had strong and unrealistic views about how the cases should be defended or settled, he was demanding and arbitrary with respect to reimbursement of his travel expenses and he announced that he would no longer come to Kehayas' office to discuss the cases, but was returning to Florida where he would be available by telephone and that Kehayas should "use the nonappearance approach" in defending the case. Although aware of the possibility of an "absent witness" charge, Kehayas believed Leonard would be a poor witness in any event and did not plan to call him to

Employers. It was the subject of a counterclaim by Employers for contribution by Vigi-

lant, which was withdrawn at trial.

testify. However, Leonard's return to Florida was the last straw for Employers. Through separate counsel, Employers announced to Kehayas and to the court that it was disclaiming all further responsibility towards Leonard, because of his noncooperation.

With matters in that posture, Kehayas and Vigilant, without informing or consulting Employers, settled both the *Osborne* and *Posmantier* cases. With considerable effort and under exigent circumstances, Kehayas effected the settlement of the *Osborne* case for $100,000 and the simultaneous settlement (when plaintiff's counsel refused to negotiate them separately) of the *Posmantier* case for $150,000. Both parties hereto agree the settlements were reasonable in amount, and it is undisputed that the jury verdict in each case might well have gone much higher.

In the present suit, Employers resists Vigilant's demand that it contribute half of the total of $250,000 which Vigilant paid on Leonard's behalf to settle the two cases.

THE ISSUES

There are essentially four issues presented. The first is whether the policy language, directed towards professional malpractice, covers Leonard's sexual activities with his patients. The second is whether Employers validly disclaimed coverage, upon its assertion of Leonard's noncooperation. The third is, assuming policy coverage and an ineffectual disclaimer by Employers, whether Employers must contribute to the settlement cost. The fourth is, if so, whether the amounts paid should be shared equally or upon some other basis.

These issues, and the subsidiary considerations affecting them, are discussed below.

DISCUSSION

1. *Policy coverage*

As set forth above, the language of Vigilant's and Employers' policies is essentially, and for relevant purposes, identical. To determine whether these policies cover Leonard's sexual activities with his patients, there are two separate considera-

tions. The first is whether the language of the policies can be read as covering sexual acts; the second is whether public policy in New York prohibits such coverage.

(a) Language of Policies:

■ Employers claims that Leonard's sexual activity with Osborne and Posmantier is not included in the rendering of or failing to render professional services, thus falling outside their policy's coverage.

A number of cases have construed similar, if not identical, language to cover such actions. *See Zipkin v. Freeman*, 436 S.W.2d 753 (Mo.1968); *L.L. v. Medical Protective Co.*, 122 Wis.2d 455, 362 N.W.2d 174 (1984); *see also Vigilant Ins. Co. v. Kambly*, 114 Mich.App. 683, 319 N.W.2d .382 (1982). As these cases explain, such conduct falls under the language of these policies as long as the sexual conduct is related to therapy. While this view has not always been applied to physicians in general, *see Smith v. St. Paul Fire and Marine Ins. Co.*, 353 N.W.2d 130 (Minn.1984) and *Hirst v. St. Paul Fire and Marine Ins. Co.*, 106 Idaho 792, 683 P.2d 440 (1984), it is particularly appropriate with respect to psychiatrists, where the transference phenomenon renders the patient particularly vulnerable. *See Zipkin*, 436 S.W.2d at 761; *L.L.*, 362 N.W.2d at 177. As the Court in *L.L.* explained,

> a sexual relationship between therapist and patient cannot be viewed separately from the therapeutic relationship that has developed between them. The transference phenomenon makes it impossible that the patient will have the same emotional response to sexual contact with the therapist that he or she would have to sexual contact with other persons.

362 N.W.2d at 178.

Employers argues that Leonard's sexual activities with his patients were solely for his own personal enjoyment and unrelated to psychiatric treatment. Employers points out that Osborne testified that Leonard never discussed their sexual activities with her, either before or after they occurred, and that her deposition testimony

indicated that Osborne herself initiated her sexual contacts with Leonard.

Similarly, Employers points to Leonard's statement to Posmantier " 'That's one thing and this is another' point[ing] to the bedroom and then to the office" as showing that none of the parties involved believed the sexual activity to be related to therapy. Def. Post Trial Memorandum, p. 8, quoting Def.Exh. 8, p. 125.

Nevertheless, in light of the transference phenomenon referred to above and other testimony of Osborne and Posmantier, the Court finds that the acts of which they complained were sufficiently related to the therapy to fall within the coverage of the insurance policies.

As explained above, the transference theory holds that it is the psychiatrist-patient relationship itself which renders the patient particularly vulnerable to the psychiatrist's actions and behavior. To benefit from therapy, the patient must place her trust in the psychiatrist, which results in her becoming emotionally dependent on the psychiatrist. *See L.L. v. Medical Protective Company*, 362 N.W.2d at 177. In this setting, the patient believes the doctor is always acting in her best interest, to make her well. What to the therapist may seem extraneous is, to the patient, part of the whole relationship. As Osborne said, the aftereffects of her experience with Leonard were depression, confusion, and "[u]pset with, I guess, being *betrayed.*" Def.Exh. 7, p. 15 (emphasis added).

The deposition testimony reveals that Leonard's sexual contacts with both Osborne and Posmantier were closely connected to his professional services. Osborne testified that she had "primal therapy" sessions with Leonard during which she and Leonard were nude and Osborne lay "on the floor, spread-eagle." Def.Exh. 7, p. 71. The purpose of these sessions was to "derepress" Osborne's repressed feelings, including those towards her father. *Id.* at 73. On one occasion Leonard engaged in intercourse with Osborne during the "primal therapy" session.

Moreover, Leonard and Osborne frequently engaged in sexual activities immediately after therapy sessions, in the bedroom of Leonard's office-apartment.

With respect to Posmantier, Leonard "ordered" her, as her physician, to remain at his apartment after a videotape session. Def.Exh. 8, p. 102. He instructed her to lie down on his bed while he showered, and to take off her clothes to show him she trusted him. He then "strongly recommended" that she stay the night. *Id.* at 103. When Posmantier, at her next session, told Leonard that the incident had upset her, he told her that she would "understand what it was he was doing" when she "got healthy." *Id.* at 125.

Posmantier testified that various sexual activities including intercourse occurred "in therapy," and during many sessions. *Id.* at 140.

Thus, Leonard's activities with Osborne and Posmantier were sufficiently related to the rendering of his therapy to fall under the coverage of Vigilant's and Employers' insurance policies, under the cases cited above, and each carrier was obligated to defend and indemnify Leonard.[2]

(b) Public Policy

█ Employers contends that because Leonard's misbehavior with his patients constitutes intentional tortious conduct, New York's public policy prohibits an insurer's indemnifying his liability for it.

---

**2.** It should be noted that a medical insurance carrier, "in the exercise of reasonable care in the operation of its business should know, that transference pertains to psychiatry and is important in treatment." *Zipkin v. Freeman,* 436 S.W.2d at 756. Companies, therefore, can exclude coverage of sexual activity between a psychiatrist and his patients from their policies, if that is what is desired; *see Vigilant Ins. Co. v. Kambry,* 319 N.W.2d at 384–85, but "[l]imitations in the policy must be clearly expressed." *Id.,* at 385; *see also Sphere Ins. Co., Ltd. v. Rosen, et al.,* No. 85–2654, slip. op. at 4 (E.D.Penn. Nov. 6, 1985) (since professional liability policy covering psychiatrist excluded coverage of activities "involving undue familiarity, sexual intimacy or assault concomitant therewith", insurance company under no duty under the policy to defend psychiatrist in action involving such claims).

Public policy in New York holds that "[o]ne who intentionally injures another may not be indemnified for any civil liability thus incurred." *Public Service Mutual Insurance Co. v. Goldfarb*, 53 N.Y.2d 392, 442 N.Y.S.2d 422, 426, 425 N.E.2d 810, 814 (N.Y.1981). To bar indemnity, however, the injury itself must have been intended; if one intended the act, but did not intend it to cause injury, indemnity is allowed. *Ibid.*

Employers states that Leonard "had to be aware that his sexual activities with these women would cause them injury" in that he abused the psychiatrist-patient relationship and "took such advantage of these women's vulnerability that it is beyond reason to believe he wasn't aware of the potential deleterious effects of his actions." Def. Trial Memorandum, pp. 6–7.

Awareness of a potential harm, however, is not the same as intending that harm. In the setting of insurance coverage for a psychiatrist who engages in sexual relations with his patients, there may be "... no reason for distinguishing between this type of malpractice and others" such as improper administration of a drug. *See Vigilant Ins. Co. v. Kambly*, 319 N.W.2d at 384–5.

Further, there is evidence that Leonard did not intend to injure his patients. When Posmantier told Leonard she was terminating therapy with him, Leonard expressed his concern "that what I have done with you has damaged you," and twice stated his hope that "on balance my therapy was more beneficial than it was harmful" and that the damages had not outweighed the benefits. Def.Exh. 8, p. 80.

There is in this record no showing of such an intent to harm as would invoke New York's public policy prohibition against coverage.

2. *Employers' Disclaimer*

■ Employers disclaimed its obligation to defend or indemnify Leonard in the *Osborne* case on the additional grounds that Leonard failed to cooperate with defense counsel, George Kehayas, Esq., during the trial.

Employers' policy provides in Conditions, section 3, in relevant part, that

"The insured shall cooperate with the company and, upon the company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits."

An insurer asserting the defense of noncooperation by the insured has the burden of proving such noncooperation, and that burden "... is a heavy one indeed." *Thrasher v. U.S. Liability Ins. Co.*, 19 N.Y.2d 793, 278 N.Y.S.2d 793, 800, 225 N.E.2d 503, 508 (1967). The insurer must show that it acted diligently in seeking to obtain the insured's cooperation, that its efforts were reasonably calculated to obtain that cooperation, and that the attitude of the insured, after his cooperation was sought, was one of "willful and avowed obstruction." *Ibid; Garcia v. Abrams*, 98 A.D.2d 871, 101 A.D.2d 601, 471 N.Y.S.2d 161, 163 (1983). Further, the insurer must establish a substantial and material breach by the insured of his duty to cooperate. *Ibid.*

The proof here does not rise to that standard. While Leonard was a difficult and irritating client, once refusing to discuss the *Osborne* and *Posmantier* cases and demanding that the cases against him be settled at one time, such behavior could not be characterized as "willful and avowed obstruction", nor did it represent a substantial or material breach by Leonard of his duty to cooperate. Nor does it appear that Leonard's behavior impeded Kehayas' ability to defend the action. Although Employers stresses Leonard's return to Florida on the eve of trial in the *Osborne* case, that incident must be viewed in proper perspective: Kehayas had told Employers that he preferred not to use Leonard as a witness (although he left the option open), Kehayas thought Leonard would be "ineffective" as a witness, and there remained the prospect that Leonard would return to the trial if required, because he was acutely aware (as Kehayas testified) that the

carriers would disclaim coverage if he refused to cooperate.

Under the circumstances, Employers' disclaimer for noncooperation was without sufficient basis, and did not relieve Employers from providing its policy coverage.[3]

■ Employers' disclaimer, however, had the immediate practical effect of making futile any further communications with Employers during the remainder of the *Osborne* case. After Employers disclaimed, there seemed little point in Kehayas or Vigilant trying to discuss proposed settlements with Employers. Taken in this light, Employers cannot now complain that its views were not solicited during the settlement negotiations. *See H.S. Equities, Inc. v. Hartford Accident and Indemnity Co.*, 609 F.2d 669 (2d Cir.1979).

As noted, Employers' disclaimer based on noncooperation related only to the *Osborne* case. However, Employers cannot successfully claim that, because its noncooperation disclaimer did not include the *Posmantier* action, it should have been consulted about the *Posmantier* settlement negotiations. It is clear there simply was not time.

The *Osborne* trial was going badly for Leonard, Employers had disclaimed all responsibility for Leonard in it, and Kehayas had only one hour, during a recess at trial, in which to effect a settlement for his client. After obtaining agreement to compromise the *Osborne* case for $100,000, Kehayas was informed by counsel for Osborne (who also represented Posmantier) that he would not settle *Osborne* separately and both cases had to be settled together, if at all. At that point, it was imperative for Kehayas (in Leonard's interest) to obtain the additional authorization to pay $150,000 to Posmantier. He was talking to Vigilant from a telephone booth with a court officer knocking on the door to summon him back to trial; and Vigilant regarded Employers as having abandoned Leon-

ard for an avowed reason (noncooperation) which appeared disingenuous, since Kehayas had told Vigilant he didn't want Leonard in or near the courtroom. Under the circumstances there was no practical opportunity or purpose for seeking to reopen discussions with Employers, and no obligation on Kehayas that he run a risk of losing the settlements by attempting to do so.

Accordingly, Employers' attempted disclaimer does not relieve it of liability under its policy, and it is obliged to contribute to the amounts paid in settlement of the cases by Vigilant.

3. *Contribution*

■ Employers attempts to cast Vigilant in the role of Leonard's subrogee, since under *Hartogs v. Employers Mutual Ins. Co.*, 89 Misc.2d 468, 391 N.Y.S.2d 962 (1977) Leonard (in contrast to Osborne and Posmantier) would have no rights against Employers. However, the point does not arise, for each carrier's liability is primary and direct.

As shown above, Employers' policy language covers the activities charged, and its disclaimers were ineffective. Employers' liability under its policy is thus primary, as it would have been had the *Osborne* case gone to judgment. Where two insurance policies provide primary coverage for the same risk, "each company is obligated to share in the cost of the settlement and the expenses." *Federal Ins. Co. v. Atlantic National Ins. Co.*, 25 N.Y.2d 71, 302 N.Y. S.2d 769, 771, 250 N.E.2d 193, 194 (N.Y. 1969); *see American Dredging Co. v. Federal Ins. Co.*, 309 F.Supp. 425 (S.D.N.Y. 1970) (where several insurers cover the same risk and payment for loss has been made by one, that carrier has a right to pro rata contribution from other insurers).

■ Employers further argues that Vigilant's settlements were purely a business decision and were thus voluntary, and Em-

---

**3.** In fact, in its trial brief Employers implies the disclaimer itself was somewhat of a tactical maneuver, saying Leonard was informed of it "... in an effort to secure Leonard's return

from Florida to participate in his defense in this case and the subsequent cases against him ..." Def. Trial Memorandum, p. 3.

ployers cannot now be compelled to contribute to the settlements. This argument fails for two reasons.

First, Vigilant's settlements were not made as a volunteer as regards Employers' liability. The malpractice claims by Osborne and Posmantier each constituted one continuing cause of action against Leonard. *See Zipkin v. Freeman*, 436 S.W.2d 753. Although Leonard was insured for malpractice by two consecutive carriers, with both policies implicated by this one cause of action, the malpractice claims were against Leonard himself, not Vigilant or Employers, and neither Osborne nor Posmantier could be expected to split their claims between the two insurance carriers. Thus, in settling the case with plaintiffs, which Vigilant was entitled to do, Vigilant was compelled to settle the malpractice claims in total, not just those occurring in its policy period.

Second, even if the settlements were considered "voluntary", Vigilant is entitled to contribution from Employers. Although New York courts once held that an insurer who voluntarily pays more than his share of a loss could not then demand contribution from a second insurer, *see New Amsterdam Casualty Co. v. Commercial Casualty Ins. Co.*, 129 Misc. 466, 222 N.Y.S. 701 (1931), "the majority of cases now recognize the undesirability of rewarding the insurer which refuses to honor its contractual obligations, and hold that payment by an insurer which properly undertakes a burden of settlement or defense does not render it a volunteer not entitled to recover." Appleman, *Insurance Law and Practice*, § 4921 at 538 (1981).

4. *Amount Of Contribution*

█ As stated above, where two insurance policies cover the same risk, and one carrier makes payment on a loss, that carrier is entitled to a pro rata contribution from the other carrier. *American Dredging Co. v. Federal Ins. Co.*, 309 F.Supp. 425.

There are two approaches for determining Employers' pro rata contribution, both of which dictate the same result: Employers must contribute 50% of Vigilant's settlement costs.

The first method looks to the "other insurance" clauses of both Vigilant's and Employers' policies, which are essentially identical in relevant part. Since the clauses are not repugnant, they can be considered for purposes of determining liability. Employers' policy provides that if a loss or expense covered by its policy is also covered by another policy, Employers will not be liable for "a greater proportion of such loss or expense than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss or expense." Since both Vigilant's and Employers' policy limits of liability are $500,000, Employers' proportional share of liability for a loss which is also covered by Vigilant's policy is 50% ($500,000/$1,000,000 = ½ or 50%).

The second method is by simple division. There are two carriers involved. Since the acts of malpractice span both coverage periods, it is impractical to apportion the liability between periods. Thus, liability and settlement costs are to be divided equally between the two carriers. *See Glacier General Assurance Co. v. Continental Casualty Co.*, 605 F.Supp. 126 (D.D.C. 1985).

Vigilant settled Osborne's claims for $100,000 and Posmantier's for $150,000, a total of $250,000. Employers must contribute $125,000, plus any unpaid portion of its 50% share of the costs of defense.

Plaintiff may settle an appropriate form of judgment on ten days notice.