**ARGONAUT INSURANCE COMPANIES, Plaintiff,**

v.

**MEDICAL LIABILITY MUTUAL INSURANCE COMPANY and Wausau Insurance Companies, Defendants.**

**No. 88 Civ. 2750 (CSH).**

United States District Court, S.D. New York.

March 13, 1991.

Mayer, Brown & Platt (Robert C. Bata and Mark C. Van Norman, of counsel), New York City, for plaintiff.

Law Office of Michael A. Ellenberg (Michael A. Ellenberg, of counsel), New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

In this diversity action presently pitting one medical malpractice insurer against another, the issue relates to the proper allocation of costs incurred in defending malpractice actions. Following extensive discovery, the parties cross-move for summary judgment under Rule 56, Fed.R.Civ.P.

## BACKGROUND

Since the mid–1960's, physicians who are members of the Medical Society of the State of New York ("MSSNY") have received medical malpractice liability insurance coverage from three insurance companies. The initial coverage was furnished by defendant Wausau Insurance Company ("Wausau"). Wausau covered MSSNY members from the inception of the coverage to June 30, 1974. When Wausau stopped writing that coverage, it was succeeded by plaintiff Argonaut Insurance Companies ("Argonaut"), which wrote medical liability insurance for MSSNY members from July 1, 1974, to June 30, 1975. Argonaut then ceased the coverage and was succeeded by defendant Medical Liability Mutual Insurance Company ("MLMIC"). MLMIC commenced its coverage on July 1, 1975. It continues to the present day.

This type of non-overlapping coverage is known in the insurance industry as "end-to-end" coverage. The policies MLMIC issues to covered physicians are annual policies, so that MLMIC maintains the coverage for a particular physician by writing a new policy for that physician at the end of each policy year. For all that appears from the record, this is the industry practice in such insurance policies.

A claim for medical malpractice may arise out of a single diagnosis or treatment, or out of a physician's allegedly negligent treatment of a patient over a number of years (for example, negligent failure to diagnose cancer). This is known as a "continuous treatment" medical malpractice claim. Within the parlance of medical malpractice insurance, a "continuous treatment case" involves allegations of malpractice spanning more than one policy period where there is a single insurer involved. An "end-to-end case" involves allegations of malpractice spanning more than one policy period where there are two or more insurers involved.

By virtue of Argonaut's relatively brief appearance on the stage of medical malpractice coverage for MSSNY physicians, it found itself involved in continuous treatment cases where the plaintiff alleged malpractice beginning during the period of Wausau's coverage, extending through Argonaut's period of coverage, and continu-

ing into MLMIC's coverage. This put Argonaut into relationship with the other two insurance companies in respect of, *inter alia*, the costs of defending against the action (attorney's fees, investigation expense, and the like). As to a continuing treatment case alleging malpractice beginning during the policy year July 1, 1974 through June 30, 1975 but extending thereafter, Wausau had dropped out of the picture, and Argonaut was in relation only with MLMIC.

A question of obvious mutual concern was how defense costs should be allocated among insurers in end-to-end cases. Until February 1987, Argonaut shared end-to-end defense costs equally with Wausau and MLMIC (or with MLMIC only, if the malpractice claimed did not arise until after Wausau's coverage had ceased). However, in February 1987 Argonaut rethought that allocation, and during that month "put the defendants [Wausau and MLMIC] on notice that it would no longer allocate end-to-end defense costs equally when the policy periods of the respective insurers were unequal." Complaint at ¶ 16. Notwithstanding that notice, the two defendants maintain that Argonaut was bound by prior agreement to allocate defense costs equally, and instructed defense attorneys handling the cases to bill their fees and expenses on an equal basis among the insurance companies concerned. Since February 1987 Argonaut continued to pay on that basis, under protest and with all rights reserved, to avoid the prejudice to itself and its insureds which would result if Argonaut placed defense counsel in the center of a conflict among the insurance companies. *Id.* at 17. Argonaut commenced this action for declaratory and injunctive relief, and for restitution for defense costs "paid by Argonaut under protest in excess of its *pro rata* share in end-to-end coverage cases." Complaint, prayer for relief at ¶ (4).

Subsequently Wausau was dismissed from the action by a stipulation of settlement endorsed by the Court on May 1, 1989. Argonaut and MLMIC continued to litigate the issue, culminating in their cross-motions for summary judgment.

Given plaintiff's theory as pleaded in the complaint, the malpractice cases forming the basis for this action involve only those cases where the malpractice plaintiff alleges negligence during Argonaut's one-year policy, and also alleges continued treatment and negligence during the period of two or more of the successive annual policies issued by MLMIC. That is because malpractice during the year of Argonaut's coverage and only during the first succeeding year of MLMIC's coverage would, even on Argonaut's theory, result in an even allocation of the costs of defense.

Argonaut's claim is based primarily upon its perception of fairness. MLMIC resists anything other than equal division of the costs of defense on two grounds. First, MLMIC contends that in an exchange of correspondence beginning in 1977, Argonaut agreed to the equal division of defense costs among the insurance companies concerned. Second, MLMIC contends that the provisions in the insurance policies with respect to "other insurance" mandate an equal division of defense costs.

MLMIC's conception of how these defenses relate to each other is not entirely clear. In its main brief, MLMIC argued that "the parties' overall agreement in 1977 and their subsequent case by case agreements supersede the policy provisions ..." 18 at n. 6. The reply brief states at 2 that if the Court determines that the "other insurance" clause obligates the two insurers to share defense costs equally, then I need not address the question of whether they entered into and are bound by a letter agreement to share defense costs equally.

It seems to me that MLMIC had the issues right the first time. Accordingly I will consider, first, the pertinent exchange of correspondence between the parties; and second, the terms of the policies.

*The Correspondence*

Under date of October 24, 1977, Marvin Kipnes, the claims supervisor for Argonaut, addressed a letter to John Andreotta, his opposite number at MLMIC. Kipnes began his letter by confirming his recent discussions with Andreotta "with regard to

the handling of claims involving overlapping coverage." Kipnes expressed the desire "to take this opportunity to ratify the methods which have served us well in the past; offer some proposals for a more efficient means of accomplishing this function; and clarify certain issues which may require same." Kipnes expressed his objective "to promulgate procedures" enabling the two insurance companies to discharge their responsibilities in manners consistent with their best interests and of their mutual insureds. "It is also hoped," Kipnes continued in the first paragraph of his letter, "that by standardizing these procedures, we can eliminate any potential friction and create an atmosphere of cooperation which will facilitate the more important decisions regarding indemnification which are likely to ensue."

Turning from the general to the particular, Kipnes dealt with a number of procedures. That portion of his letter most pertinent to the dispute at bar appears in the third paragraph, which I quote in full:

It is the consensus of opinion among the management of Argonaut and Ed Bourbeau of Employers Insurance of Wausau that the carrier with the greatest exposure should maintain the right to designate both the adjustor and the attorney and accept responsibility for originating the assignment or referral. The other carrier would then have the option of participating, on an equal basis, in the expenses associated with the investigation and defense. In the alternative, they may conduct an independent instigation and/or assign co-counsel to monitor the defense. The relative exposure would be fixed by a determination of which carrier provided coverage to the insured during the time when the treatment or surgery, which is the basis for the claims, occurred. In those instances where the exposure is not readily definable, the carrier which provided coverage to the insured for a preponderance of the time in question, would assume this role. The assignments would be subject to change if the discovery process reveals that the initial assessment was incorrect.

Kipnes concluded this pleasant missive with this paragraph:

Please consider these proposals and suggestions and favor us with a response at your earliest opportunity. Thank you for your time and cooperation in this matter.

Andreotta favored Kipnes with his response in a letter dated November 4, 1977. The first three paragraphs of that letter are pertinent to the present dispute. They read as follows:

Thank you for your letter of October 24, 1977. As you pointed out, it is good to have these understandings in writing. We discussed this further on Thursday, November 3, 1977 and I would like to present in this note to you our agreement with the many points presented in your letter.

Your presentation of the approach to be taken on cases involving end-to-end coverage between our companies is exactly that which we have discussed in the past and we are in full agreement with the approach.

To insure that there be no misunderstanding of our respective positions, I am preparing copies of your letter of October 24, and copies of this letter, so that all the members of our staff can have this correspondence to serve as a guideline for future activity.

Under date of July 25, 1979, Kipnes had occasion to write another letter to Andreotta. That letter referred to meetings between representatives of the two companies on July 10, 1979, at which they "discussed several matters of mutual interest and explored the means through which we could promote a greater degree of cooperation." Kipnes then wrote:

We have both reaffirmed our willingness to participate jointly in the investigation and defense of cases involving end-to-end coverage, whenever possible, and share equally in the expenses associated with same.

To implement these procedures Argonaut's Malpractice Claims Department prepared a draft letter to be sent to MLMIC with respect to malpractice claims falling

within the joint concern of the two companies. I reproduce below an example of that form letter indicating by the use of brackets the spaces left blank and to be filled in to reflect the circumstances of the particular cases:

> This will confirm our telephone conversation of [                    ]. At that time we discussed the coverage which [                ] has for the above loss.
>
> A review of the information reveals that the plaintiff's attorney will allege negligence from [                ], which spans your coverage period, our coverage period and [                ] coverage period. Obviously, we have an end-to-end coverage situation. As such, we have agreed to share equally in the expenses associated with the instigation and defense of this matter in his behalf. *Please instruct* (we have instructed) the adjustor and the attorney to forward copies of their reports to our respective offices simultaneously, and copies of their bills to both companies, with indication of the amount due from each. We have provided appropriate advices to the insured with regard to our proposed handling of this matter.

As alleged in its complaint, Argonaut sought to put an end to that equal division of defense costs when it gave notice to that effect to Wausau and MLMIC in February 1987.

*The Provisions of the Insurance Policies*

The Argonaut policy and the MLMIC policy contain identical "other insurance" clauses. That clause provides as follows:

> *Other Insurance.* If the insured has other insurance against loss or expense covered by this policy, the company shall not be liable under this policy for a greater proportion of such loss or expense than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss or expense.

The case for Argonaut arising out of this clause is that it expressly provides for the pro rata allocation of defense expenses (a proposition which I do not understand

MLMIC to challenge); and that the proper calculation of the total applicable limits of liability against defense expenses must take into account the number of annual policies MLMIC issued with respect to the physician sued for malpractice (a proposition MLMIC strenuously resists). In its main brief at 29–30 Argonaut illustrates its calculations. It assumes 17 consecutive one-year insurance policies issued to a particular physician: four by Wausau, one by Argonaut (makes covered the risk for only one year) and the remaining twelve by MLMIC. On those facts, Argonaut made the following argument:

> All seventeen policies are exposed to potential liability, so the total applicable limit of liability of all insurance against the *defense expense* in this case is 17 times the per person limit of liability per policy ($1,000,000), for a total of $17,000,000. The ratio of Argonaut's limit of liability to the total applicable limit of liability of all insurance against such expense is 1 to 17, so Argonaut is obligated to pay one-seventeenth (6%) of defense expenses. Wausau is liable for four-seventeenths (24%) of the defense expenses and MLMIC is liable for the remaining twelve-seventeenths (70%) of the defense expenses. (emphasis in original).

MLMIC's response is that no matter how many times a policy is annually renewed, the policy limitation never exceeds $1,000,000, so that there is no difference between the liability exposure of the two companies, and defense costs should be allocated accordingly.

Argonaut says this is not fair because MLMIC has by definition received more premiums from the physician in question. MLMIC says it is not a question of fairness but of agreement and provisions of the policies.

## DISCUSSION

*The Correspondence*

■ Argonaut contends that its purported agreement to share defense costs equally with MLMIC falls within the Statute of

Frauds of New York, General Obligations Law § 5–701 (McKinney's 1989).

The statute provides in pertinent part: a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

1. By its terms is not to be performed within one year from the making thereof....

Argonaut further contends that the exchange of correspondence quoted *supra* is not sufficient to satisfy the statute.

I agree with MLMIC that the alleged agreement does not fall within the Statute of Frauds. The provision upon which Argonaut relies applies to an agreement which "by its terms" could not be performed within one year. Unless the wording of the agreement requires that construction, the agreement does not fall within the statute. *See Weiner v. McGraw–Hill, Inc.*, 57 N.Y.2d 458, 464, 457 N.Y.S.2d 193, 196, 443 N.E.2d 441, 444 (1982). In the case at bar, each malpractice claim falling within Argonaut's coverage could have been disposed of by motion, settlement or trial within one year. One may concede that is unlikely, but likelihood is not the issue. Application of the Statute of Frauds depends upon the explicit terms of the agreement. *See Shirley Polykoff Advertising Inc. v. Houbigant, Inc.*, 43 N.Y.2d 921, 922, 403 N.Y.S.2d 732, 733, 374 N.E.2d 625, 626 (1978) ("This contract is not one which by its terms can be performed within a year. If it were, it would be without the statute even if, as a practical matter, it were well nigh impossible of performance within a year.")

■ I conclude, therefore, that the agreement to share expenses which MLMIC alleges Argonaut entered into does not fall within the Statute of Frauds. But that does not end the inquiry. It must still appear that the exchange of correspondence gives rise to a binding contract.

In *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69 (2d Cir.1989), the Second Circuit considered whether an exchange of memoranda between the parties gave rise to a binding and enforceable contract. The Court of Appeals stated generally that a party's

intent to be bound was revealed by (1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions.

Of those factors the first, "the language of the agreement, is the most important." 884 F.2d at 72.

In the case at bar, Kipnes' exchange of correspondence with Andreotta clearly expresses an intent by Argonaut to be bound by the procedures Kipnes himself suggested. Kipnes characterized his suggestions, including equal division of defense costs, as "proposals" and recommended them to Andreotta as "a means of standardizing these procedures" between the insurance companies involved. That language appears in the October 24, 1977 letter. In his November 4, 1977 reply on behalf of MLMIC, Andreotta expressed his "full agreement with the approach" proposed by Kipnes, and even circulated copies of Argonaut's October 24, 1977 letter and copies of his response to his staff, so that they could have "this correspondence to serve as a guideline for future activity." Argonaut's subsequent correspondence, including the drafting of the form letter to be used in processing claims, implements Kipnes' proposal to which Andreotta agreed. Thus "partial performance" of the agreement by Argonaut is evidenced; and the "context of the negotiations" consisted of the insurance companies attempting to work out guidelines and procedures for the prompt and efficient handling of claims. Thus a number of factors articulated by the Second Circuit in *Arcadian Phosphates* militate in favor of the conclusion that Argonaut and MLMIC entered into a binding agreement for the division of defense costs.

Argonaut argues that the Kipnes letter of October 24, 1977 was too vague and preliminary to give rise to a binding agree-

ment. I do not agree. The language Argonaut particularly relies upon is this:

> The other carrier would then have the option of participating, on an equal basis, in the expenses associated with the investigation and defense. In the alternative, they may conduct an independent investigation and/or assign co-counsel to monitor the defense.

Admittedly this language gave Argonaut an option as to how to proceed, that option to be exercised on a case-by-case basis. In a given case, Argonaut could participate "on an equal basis" in the expenses of investigation and defense. However, with respect to any particular case Argonaut retained the option to conduct its independent investigation or assign co-counsel to "monitor the defense." If Argonaut chose that option, then presumably each insurance company would bear the cost of its own investigation and defense counsel. In point of fact, Argonaut appears to have followed the equal division of costs as a matter of routine. Certainly all the cases involved in this litigation arise out of such conduct on Argonaut's part. In any event, the existence of an option Argonaut might exercise in a particular case does not undermine its agreement to equally divide defense costs if it chose not to exercise that option.

Accordingly I conclude that this exchange of correspondence constitutes an agreement binding upon Argonaut.

*The Policy Provisions*

■ If I am wrong in this conclusion concerning Argonaut's express contractual agreement with MLMIC, then the case turns upon the proper construction of the "other insurance" clause, identical in both the Argonaut and the MLMIC policies.

Unlike the letters exchanged between Argonaut and MLMIC, which give rise to a contract between those parties, the policies of insurance are contracts between the insuring company and their insureds. Nonetheless, the "other insurance" clause in the policies contemplates the existence of another insurance company involved in the same loss or claim; the clause speaks directly to allocation of "loss or expense" in such circumstances.

In their cross-motions and briefs, the parties adopt a useful and pragmatic approach to the issues that divide them. The Court is asked to decide general questions of contract and policy construction. The application of the Court's rulings to the particular facts of the case may require additional consideration or litigation. For present purposes, the briefs of counsel assume that each policy issued by Argonaut and MLMIC had an applicable limit of liability stated in the declarations of $1 million per person. *See, e.g.,* MLMIC's main brief at 19. In the context of that assumption, Argonaut makes the argument previously noted, that its pro rata liability for defense expenses is one-seventeenth, there having been 17 consecutive one-year policies issued by Wausau, then by Argonaut, and more recently by MLMIC, with Argonaut having issued the coverage for only one year.

MLMIC argues that in respect of any malpractice claim involving both the Argonaut policy and MLMIC policies, the proper pro rata division of defense costs is an equal division.

MLMIC's contention is supported by two decisions of this Court: *Emons Industries, Inc. v. Liberty Mutual Fire Insurance Co.,* 481 F.Supp. 1022 (S.D.N.Y.1979) (Duffy, J.), and *Vigilant Insurance Company v. Employers Insurance of Wausau,* 626 F.Supp. 262 (S.D.N.Y.) (Stanton, J.). Argonaut says these cases are distinguishable or wrongly decided. I do not agree.

*Emons* involved product liability insurance. The product involved was that synthetic estrogen drug which came to be known as DES, a drug subsequently revealed to be a potential cause of cancer in women who ingested it during pregnancy, as well as in their female offspring. One insurance company, Liberty, insured Emons against product liability under a series of annual policies between 1964 through 1970. Another insurance company, Reserve, insured Emons against product liability for a one-year period from November, 1970 through November, 1971. A number

of actions were commenced against Emons for damages suffered by daughters of women who had taken DES during their pregnancies. It was apparent from the pleadings that the claims might "fall within either Liberty's coverage or that of Reserve." 481 F.Supp. at 1026. The issues before Judge Duffy, generated by Emons' declaratory judgment action against the two insurers and the latter's cross-motions for summary judgment, included the amount of Reserve's proper contribution to the past and future defense of Emons. On that point, Reserve made the same argument Argonaut makes in the case at bar:

> Reserve argues that it owes only its proportionate share of the litigation expenses. It computes this share by use of a rather interesting, albeit self serving, formula: since the complaints in issue specify a period of exposure to DES and a manifestation of medical problems between 1947 through 1975, the amount to be contributed to litigation expenses should be fixed by the number of years a given carrier insured Emons over the liability years. Despite its facial appeal, this formula of apportionment must be rejected. 481 F.Supp. at 1025–26.

Judge Duffy rejected that argument because "Reserve's duty to defend Emons extends beyond its duty to indemnify"; each complaint against Emons comprehended "injuries potentially within the coverage of Reserve's policy despite the fact that the policy protected Emons for only a one year period"; and

> the disparate number of years of coverage notwithstanding, both insurance companies stand on equal footing with respect to potential liability and their concomitant duty to defend. Id. at 1026 (footnote omitted).

In these circumstances, Judge Duffy directed Reserve to reimburse Liberty for one half of defense costs previously incurred. As to future claims, Judge Duffy's initial opinion permitted Reserve to designate trial counsel of its own choosing to represent Emons, in which event it would have satisfied "its obligation to defend Emons." Should Reserve decide to permit counsel designated by Liberty to continue to represent Emons, then Reserve was obligated to "contribute its pro rata share of the litigation expenses." Id. at 1027. In an amended opinion, Judge Duffy deleted his directions for future representation, since "there is no indication that any conflict presently exists either between the insured and the insurance companies or between the insurance companies themselves"; nor did a future conflict of interest appear likely. Accordingly the judge concluded that "it was inappropriate to permit Reserve to retain independent counsel to defend the plaintiff," that being a choice belonging only to the plaintiff. Judge Duffy concluded his amended opinion by directing Reserve "to satisfy its duty to defend plaintiff by contributing its pro-rata share of the current defense costs." Id. at 1028.

Judge Duffy did not further define "pro rata share" in respect of current defense costs; but there is no reason to suppose, given his prior analysis, that the division would be other than equal as between Liberty and Reserve.

In *Vigilant Insurance Company*, the two warring Insurance companies covered against malpractice claims a psychiatrist who had sexual intercourse with his patients. One insurance company, Employers, covered the psychiatrist from January 1, 1970 through June 30, 1973. Vigilant was his carrier from July 1, 1973 to May 1, 1978. The coverage was essentially identical. In addition, each policy contained an "other insurance" clause comparable to those at bar. See 626 F.Supp. at 269. Vigilant having settled two claims against the insured psychiatrist, the issue arose of Employer's obligation to make a pro rata contribution.

Judge Stanton began with the general proposition that "where two insurance policies cover the same risk, and one carrier makes payment on a loss, that carrier is entitled to a pro rata contribution from the other carrier." Id. at 269. In his view, "there were two approaches for determining employers' pro rata contribution, both of which dictate the same result: Employers must contribute 50% of Vigilant's settlement costs." Ibid. The first approach

is that relied upon by MLMIC in the case at bar. Judge Stanton said:

> The first method looks to the "other insurance" clauses of both Vigilant's and Employers' policies, which are essentially identical in relevant part. Since the clauses are not repugnant, they can be considered for purposes of determining liability. Employers' policy provides that if a loss or expense covered by its policy is also covered by another policy, Employers will not be liable for "a greater proportion of such loss or expense than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss or expense." Since both Vigilant's and Employers' policy limits of liability are $500,000, Employers' proportional share of liability for a loss which is also covered by Vigilant's policy is 50% ($500,000/$1,000,000 = ½ or 50%). *Ibid.*

The second method Judge Stanton described as one of "simple division," proceeding from the facts that two carriers were involved, and "[s]ince the acts of malpractice span both coverage periods, it is impractical to apportion the liability between periods." *Ibid.* That alternative basis of decision in *Vigilant* is arguably distinguishable from the case at bar, where the disparity in coverage periods is more pronounced, and accordingly lends itself (or so Argonaut contends) to an easier apportionment of liability.

But those circumstances do not affect Judge Stanton's first ground for decision, which seems to me right and is fully applicable to the case at bar. I also think that the disparate number of years of coverage, which lies at the heart of Argonaut's argument, has no significance in the proper apportionment between the two insurance companies. That is the conclusion Judge Duffy reached in *Emons*, and I think he was right. The basic flaw in Argonaut's conception is that the potential liability of the two companies—$1 million for each of them—remains the same, no matter how many times MLMIC renewed its one-year policies. Renewing a $1 million policy for ten years does not convert it into a $10 million liability coverage. No one contends

that is so, not even the Argonaut witnesses who testified at deposition. This seems to me the governing reality. To be sure, MLMIC received more premiums on the risk because it renewed the coverage; but I do not think that gives Argonaut a "fairness" argument sufficient to overcome the provisions of the "other insurance" clauses, where "loss or expense" are treated alike for the purpose of apportionment among two policies covering the same risk.

Argonaut relies upon Judge Weinfeld's opinion in *National Grange Mutual Insurance Co. v. Continental Casualty Co.*, 650 F.Supp. 1404 (S.D.N.Y.1986), *affirmed on rehearing* slip op. 85 Civ. 5783 (Feb. 11, 1987). While in the circumstances of *National Grange* Judge Weinfeld required contribution "from each insurer in proportion to the aggregate limit of its coverage under the relevant primary policies issued by it," *opinion on rehearing* at slip op., it does not appear that there was an agreement reached by letters between the insurance companies, as in the case at bar; Judge Weinfeld was apparently not presented with "other insurance" clauses, as in the case at bar; and to the extent Judge Weinfeld relied upon New York law, *see* 650 F.Supp. at 1413 n. 37, the Second Circuit has subsequently said his conclusion "is of doubtful validity." *Federal Insurance Company v. Cablevision Systems Development Co.*, 836 F.2d 54, 60 (2d Cir. 1987).

While the parties raise other arguments in their briefs, I need not reach them. For the reasons stated, I conclude that MLMIC is correct, and that there must be an equal division of defense costs as between these two insurers.

Accordingly Argonaut's motion for summary judgment is denied. MLMIC's cross-motion is granted. Counsel for MLMIC are directed to settle an order and judgment consistent with this Opinion on seven (7) days' notice not later than thirty (30) days of the date of this Opinion.

It is SO ORDERED.