Tiffany **DODGE**, Plaintiff,

v.

**LEGION INSURANCE COMPANY** and **Mark Morrison,** Defendants.

**No. 99 CIV. 10563(SAS).**

United States District Court, S.D. New York.

April 19, 2000.

Michael P. Eisenman, Miller & Eisenman, LLP, New York City, for plaintiff.

W. Robert Devine, Ivone, Devine & Jensen, LLP, Lake Success, NY, for defendant Legion Insurance Company.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Tiffany Dodge brings this action for a declaratory judgment against Legion Insurance Company ("Legion") and Mark Morrison. Dodge seeks a declaration that Legion, Morrison's liability insurance carrier, is obligated to indemnify Morrison, Dodge's former psychiatrist, for any judgment Dodge may obtain in an action against Morrison now pending in Supreme Court Putnam County. In that action, Dodge is seeking damages for injuries caused by Morrison's alleged sexual contact with Dodge while she was his patient.

Dodge moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. Dodge argues that Legion is estopped from disclaiming coverage because it did not promptly notify Dodge of its intent to disclaim coverage, and thus failed to comply with the notice requirement of section 3420(d) of the New York Insurance Law.[1] Dodge further argues that allowing indemnification here is consistent with the public policy of New York, which forbids indemnification for intentionally caused injuries but does not bar indemnification for the accidental consequences of intentional conduct.

Legion cross-moves for summary judgment declaring that it is not obligated to indemnify Morrison. Legion argues that

Morrison's alleged intentional misconduct is beyond the scope of the insurance policy as written, and that failure to give notice cannot create coverage where none exists. Legion also contends that public policy bars indemnification here because an intent to injure Dodge must be inferred from the intentional nature of Morrison's inherently harmful conduct. For the following reasons, Legion's motion is granted.

## I. Background[2]

### A. The Underlying Dispute

At the time of the events giving rise to the underlying action, Morrison was a psychiatrist licensed to practice medicine in the State of New York. See Plaintiff and Defendant Legion's Amended Rule 56.1 Statement of Stipulated Facts ("Pl. & Def. 56.1") ¶¶ 3–4. Morrison had specialized in psychiatry since his graduation from New York Medical College in 1980. See Deposition of Mark Morrison ("Morrison Dep."), Ex. B to 2/22/00 Affidavit of W. Robert Devine, Attorney for Defendant Legion ("Devine Aff."), at 7. By 1984, he had completed a psychiatric internship and residency at the New York Medical College Westchester County Medical Center. See id. After completing his residency, Morrison held several professional positions at various county, state and community health agencies. See id. at 8, 9–10, 12–13, 16–17.[3] In addition, Morrison maintained a private psychiatric practice, which he operated from a building adja-

1. The parties agree that this case is governed by the substantive law of New York.

2. The following facts are taken from the parties' Local Rule 56.1 statement of undisputed facts and the documents submitted in support of the motions. Unless otherwise indicated, the facts are undisputed.

3. From 1984 to 1993, Morrison had worked as a unit chief of the Crisis Intervention Center for the County of Westchester. See id. at 8. In the late 1980s, he became the medical director and psychiatric consultant for an agency called Community Based Services,

which operated several group homes for the mentally retarded and developmentally disabled. See id. at 12–13. In 1993, Morrison left the Crisis Intervention Center and accepted the position of a division director at the Department of Community Mental Health of the County of Westchester in Peekskill, New York. See id. at 9–10. He had also worked as a psychiatrist consultant for the State of New York Office of Mental Retardation and Developmentally Disabled and had provided psychiatric consulting services to several nursing homes. See id. at 16–17.

cent to his residence in Brewster, New York. *See id.* at 8.

Dodge became Morrison's patient in late 1993. *See* Pl. & Def. 56.1 ¶ 1. She first consulted Morrison because she was suffering from headaches. *See* Morrison Dep., Ex. B to Devine Aff., at 24–25. During the course of her therapy, Dodge told Morrison that she had been sexually abused in her childhood and raped at the age of fourteen. *See id.* at 63, 65; Examination Before Trial of Tiffany Dodge ("Dodge Exam."), Ex. A to Devine Aff., at 37–38, 60–61. As the therapy progressed, Morrison's diagnosis began to change and he eventually concluded that the underlying causes of Dodge's headaches were depression and an anxiety disorder; he also suspected a multiple personality disorder. *See* Morrison Dep., Ex. B to Devine Aff., at 50, 67–68.

As part of the treatment, Morrison engaged Dodge in relaxation training. *See id.* at 75; Pl. & Def. 56.1 ¶ 6. It was during the relaxation training, Dodge claims, that Morrison initiated a sexual relationship with her. *See* Dodge Exam., Ex. A to Devine Aff., at 117, 120. Dodge alleges that during several of her office visits, at Morrison's request, she and Morrison engaged in a variety of sexual activities. *See id.* at 117, 120–21, 125–26. According to Dodge, the sexual relationship with Morrison made her feel vulnerable and ashamed. *See id.* at 128. When she suggested that she would tell somebody about the relationship, Morrison threatened to have her committed to a psychiatric institution and her young son placed in foster care. *See id.* at 128–31; Pl. & Def. 56.1 ¶ 11. Morrison, on the other hand, denies having ever had any sexual contact with Dodge or having ever threatened her. *See* Morrison Dep., Ex. B to Devine Aff., at 89–90.

Dodge terminated her therapy in July 1995. *See* Pl. & Def. 56.1 ¶ 1. Shortly thereafter, Morrison's relationship with Dodge became the subject of disciplinary and criminal proceedings against him. After a hearing, the Board of Professional Medical Conduct found that from approximately June 1994 to May 1995 Morrison engaged in sexual activities with Dodge during therapy sessions, while Dodge was in a deeply relaxed state. *See* Pl. & Def. 56.1 ¶¶ 8–9. The Board also found that Morrison had advised Dodge that sexual relations with him would improve her sex life. *See id.* ¶ 10. On December 30, 1996, the Office of Professional Medical Conduct of the State of New York Department of Health ("the OPMC") revoked Morrison's license to practice medicine. *See id.* ¶ 13. Based on Morrison's conduct with Dodge, the OPMC found Morrison guilty of negligence, gross negligence, fraudulent practice, engaging in sexual conduct with a patient, moral unfitness, willful harassing, abusing or intimidating patients and failing to maintain accurate records. *See id.* ¶¶ 14–15. Then on January 24, 1997, Morrison was convicted of thirteen counts of sexual abuse in the third degree in violation of section 130.55 of the New York Penal Law. *See id.* ¶ 16. Twelve of the thirteen counts were related to Morrison's sexual activities with Dodge while Dodge was his patient. *See id.* ¶ 17.

On or about August 26, 1996, Dodge sued Morrison in the Supreme Court of the State of New York, asserting claims of medical malpractice, negligent infliction of emotional distress, and reckless and wanton conduct ("the underlying action"). *See id.* ¶¶ 20–21. In that action, currently scheduled for trial on April 24, 2000, Dodge seeks damages for injuries caused by Morrison's inappropriate sexual activities with her from July 1994 to May 1995. *See id.* ¶¶ 27–28.

**B. The Legion Policies**

Legion was Morrison's professional liability insurance carrier during 1994 and 1995. *See* Pl. & Def. 56.1 ¶ 22.[4] During

---

4. At those times, Morrison was also covered by an excess professional policy issued by

Psychiatrists' Risk Retention Group, Inc.,

the events complained of in the underlying action, Morrison was covered by two Legion policies. The first policy was in effect from May 1, 1994 to May 1, 1995 ("1994 Policy"); the second policy was in effect from May 1, 1995 to May 1, 1996 ("1995 Policy").[5] *See* 1994 Policy at Declarations; 1995 Policy at Declarations.

The two policies are similar in their most significant respects. First, both cover only claims for injuries arising out of "occurrences" that take place during the policy period. *See* 1994 Policy at 7; 1995 Policy at 1.[6] The two policies' definitions of an "occurrence" are almost identical. The 1994 policy defines an occurrence as "an act, error or omission in psychiatric services rendered that is *neither expected nor intended* from the standpoint of [the psychiatrist] and which (a) takes place during the Policy Period and (b) results from a Covered Activity." 1994 Policy at 10 (emphasis added). Similarly, the 1995 policy states that an "occurrence" is "an error or omission in [p]sychiatric [s]ervices rendered by a [psychiatrist] that (a) is *neither expected nor intended* by the [psychiatrist], and (b) takes place during the Policy Period." 1995 Policy at 1 (emphasis added).

Second, the two policies contain identical sets of exclusions, including exclusions for the following types of claims:

> H. [A]ny claim for or award of punitive, multiplied, or exemplary damages, or any damages imposed as a punishment of the party against whom they are awarded . . . .

which is not a party to this proceeding. *See id.*

5. The 1994 and 1995 policies are attached to the Devine Affidavit as exhibits D and E respectively.

6. The 1994 policy establishes this limitation on coverage in its "Conditions" section, which provides that the policy "shall apply to all claims . . . arising out of occurrences that take place during the Policy Period." 1994 Policy at 7. The 1994 policy's "Insuring Agreement" section provides more generally that, "subject to all of the terms, limitations,

> I. Any claim, damages or cause of action, based in whole or in part on, or involving a claim of Undue Familiarity as defined herein, if Undue Familiarity is an essential element of such claim, damages or cause of action, irrespective of the manner in which such claim, damages or cause of action is characterized.

> J. Any claim, damages or cause of action, based in whole or in part on actual or alleged mishandling of the transference or counter-transference phenomena, harassment or abandonment, where the [psychiatrist] is alleged to have engaged in, or has engaged in, Undue Familiarity with the Claimant, as the terms Undue Familiarity and Claimant are defined herein.

> K. Any claim, damages or cause of action arising out of or in connection with any dishonest, fraudulent, criminal, maliciously or deliberately wrongful acts or omissions, or violations of law committed by the [psychiatrist].

1994 Policy at 6; *see also* 1995 Policy at 4. Both policies define "undue familiarity" as follows:

> "Undue Familiarity" means, with respect to a patient, a former patient, or a member of the patient's or former patient's immediate family or household (hereinafter the "Claimant"), any actual or alleged sexual or social relationship between a [psychiatrist] and the Claimant or any actual or alleged physical contact by a [psychiatrist] of such Claimant, or any other demonstrated in-

exclusions and conditions of [the] policy," Legion is obligated to pay on behalf of the insured "all sums . . . which [the insured] shall become liable to pay as damages arising out of acts, errors or omissions in psychiatric services rendered and occurring during the Policy Period." *Id.* at 2. In contrast, the 1995 policy in its "Insuring Agreement" section provides that Legion is obligated to pay "all sums for which [an insured] shall become liable to pay as Damages for Injury directly resulting from an *occurrence* during the Policy Period." 1995 Policy at 1 (emphasis added).

tention or act for the purpose of sexual gratification or stimulation, including but not limited to, with respect to such Claimant any actual or alleged mishandling of the transference or countertransference phenomena, harassment, and abandonment.

1994 Policy at 10; *see also* 1995 Policy at 8.

## C. Legion's Reservation of Rights Letters

On September 24, 1996, Morrison notified Legion of Dodge's lawsuit by providing Legion with a copy of Dodge's complaint. *See* Pl. & Def. 56.1 ¶ 23. Legion subsequently sent Morrison two reservation of rights letters, one on October 8, 1996 and one on October 3, 1997, advising Morrison that Dodge's claims fell within various policy exclusions. *See id.* ¶¶ 24–25. Legion did not, however, notify Dodge of its intent not to indemnify Morrison. *See id.* ¶ 26. Dodge found out about Legion's position only on August 28, 1998, when Morrison's attorney in the underlying action gave Dodge's attorney a copy of Legion's second reservation of rights letter. *See id.*

## D. Present Action

On October 14, 1999, Dodge commenced this action for a judgment declaring that Legion is estopped from disclaiming coverage because of its failure to give Dodge prompt written notice of intent to disclaim required under section 3420(d) of the New York Insurance Law. *See* Complaint in Action for Declaratory Judgment ("Compl.") at 7.[7] Both Dodge and Legion have moved for summary judgment pursuant to Rule 56.

7. Subject matter jurisdiction is based on 28 U.S.C. § 1332. Dodge is a resident of Connecticut. *See* Compl. ¶ 2. Legion is a Pennsylvania corporation with a principal place of business in Philadelphia, authorized to do business in New York. *See id.* ¶ 3. Morrison

## II. Legal Standard

A motion for summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 86 (2d Cir.1996). The moving party has the burden of identifying the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997). The Second Circuit has offered the following summary of the relevant standard:

> While genuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law. A reasonably disputed, legally essential issue is both genuine and material and must be resolved at trial.

*Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 5 (2d Cir.1999) (internal quotation marks omitted). In determining whether summary judgment should be granted, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See D'Amico v. City of N.Y.,* 132 F.3d 145, 149 (2d Cir.), *cert. denied,* 524 U.S. 911, 118 S.Ct. 2075, 141 L.Ed.2d 151 (1998). Summary judgment is appropriate if no rational jury could find for the non-moving party. *See id.*

was a resident of New York at the time of the underlying events, although he currently resides in New Hampshire. *See id.* ¶¶ 4–5. The amount in controversy exceeds $75,000. *See id.* ¶ 7.

### III. Discussion

#### A. Legion's Policies Do Not Cover Dodge's Claim

■ The first issue to be resolved is whether Legion's policies, as written, obligate Legion to indemnify Morrison for damages arising out of his sexual misconduct with Dodge. In deciding whether a liability insurance policy covers a particular claim, a court must inquire whether the allegations of the complaint put the claim within the scope of the policy. *See Allstate Ins. Co. v. Mugavero*, 79 N.Y.2d 153, 162, 581 N.Y.S.2d 142, 589 N.E.2d 365 (1992). The analysis, however, "depends on the facts which are pleaded, [and] not [on] the conclusory [legal] assertions." *Id.* Thus, it is the factual allegations of the complaint, and not its legal characterizations of the underlying events that determine the availability of coverage. *See id.* at 162–63, 581 N.Y.S.2d 142, 589 N.E.2d 365 (refusing to accept a complaint's characterization of defendant's conduct as negligent when the complaint alleged only "intrinsically intentional acts of assault, sodomy and sexual abuse"); *see also Greenberg v. National Chiropractic Mut. Ins. Co.*, No. 96 Civ. 0052, 1996 WL 374145, at *1–3 (S.D.N.Y. July 3, 1996).

■ Dodge's claim falls squarely within the Legion policies' exclusion for claims of "undue familiarity." The policies define undue familiarity to include any sexual relationship between an insured psychiatrist and a patient. *See* 1994 Policy at 10; 1995 Policy at 8. The parties here agree that Dodge's claim arises out of Morrison's sexual activities with Dodge. *See* Pl. & Def. 56.1 ¶ 28.

■ In addition, Dodge's claim is outside the scope of coverage accorded by the policies because it does not arise out of an occurrence. Legion's policies cover only those claims caused by an "occurrence," which the policies define as an act or omission that is "neither expected nor intended" by the psychiatrist. *See* 1994 Policy at 7, 10; 1995 Policy at 1. In the underlying action, Dodge asserts causes of action sounding in negligence and recklessness. *See* Verified Complaint, Ex. C to 2/14/00 Affidavit of Michael P. Eisenman, Attorney for Dodge ("Eisenman Aff."), ¶¶ 12–14 (alleging "negligent, careless, reckless and outrageous conduct" in the course of medical treatment); *id.* ¶¶ 18–21 (asserting a claim of negligent infliction of emotional distress); *id.* ¶¶ 23–24 (alleging "reckless, gross and wanton" conduct). The pleaded factual basis of these claims, however, consists solely of an allegation of "kissing, embracing, sodomizing and engaging in intercourse" with Dodge during her therapy sessions. *Id.* ¶ 12. Because these acts are intrinsically intentional, they do not constitute an occurrence within the meaning of Legion's policies.

Dodge does not expressly address the issue of whether the underlying claim arises out of an occurrence as that term is defined in the policies. In addressing other issues, however, Dodge argues that her claim implicates the established distinction between intentionally caused injuries and unintended consequences of intentional conduct. Dodge contends that her injuries should be considered accidental because, even if Morrison's misconduct itself was intentional, there is no evidence that Morrison intended to harm Dodge. *See* Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment ("Pl. Mem.") at 11–13; Memorandum of Law in Opposition to Defendant's Cross–Motion for Summary Judgment and in Further Support of Plaintiff's Motion for Summary Judgment ("Pl. Reply Mem.") at 4–6.

■ Insurance policies frequently limit coverage to injuries resulting from accidents or exclude coverage for intentionally caused harm. *See, e.g., Jubin v. St. Paul Fire & Marine Ins. Co.*, 236 A.D.2d 712, 713, 653 N.Y.S.2d 454 (3d Dep't 1997) (interpreting a liability insurance policy that covered only claims arising out of accidents and also specifically excluded from coverage claims for intentionally caused

injuries). Accordingly, courts must often distinguish accidental from intentional injuries when interpreting insurance policies. *See, e.g., id.* It is well settled that an injury may be accidental even though it results from an intentional act. *See, e.g., Continental Cas. Co. v. Rapid–American Corp.,* 80 N.Y.2d 640, 649, 593 N.Y.S.2d 966, 609 N.E.2d 506 (1993). For example, in *Allegany Co-op. Insurance Co. v. Kohorst,* 254 A.D.2d 744, 678 N.Y.S.2d 424 (4th Dep't 1998), the claimant in the underlying action was seeking damages for burn injuries sustained during a fire that had been intentionally set by the insured. *See id.* at 425. The trial court granted summary judgment to the insurer, declaring that the insurer had no duty to defend or indemnify the insured because the fire had been started intentionally and the injuries did not result from an occurrence, which was defined in the policy as an "accident." *See id.* at 424–25. The Appellate Division disagreed, reasoning that "[a]ccidental results can flow from intentional acts." *Id.* at 425. The court further explained that coverage would be required under the policy if the alleged damages arose "out of a chain of unintended though foreseeable events that occurred after the intentional act." *Id.* Because the evidence in *Allegany* established that the insured did not intend to injure the claimant, the Appellate Division held that the underlying suit involved an accident within the meaning of the policy. *See id.*

When the alleged harm is an inherent result of the act, however, intent to injure will be inferred as a matter of law from the intentional character of the conduct. As the Court of Appeals explained in *Mugavero,* the seminal New York case on the issue of inferred intent, for certain types of conduct "cause and effect cannot be separated; ... to do the act is necessarily to do the harm which is its consequence." 79 N.Y.2d at 160, 581 N.Y.S.2d 142, 589 N.E.2d 365. In such cases, if the act is intentional, so is the harm, and the courts will not inquire into the perpetrator's subjective intent to cause the injury. *See id.* at 160–61, 581 N.Y.S.2d 142, 589 N.E.2d 365; *see also Nationwide Mut. Fire Ins. Co. v. Distaffen,* 51 F.Supp.2d 271, 273 (W.D.N.Y.1998) ("[A]n insured's intentional act [cannot] be an accidental cause of injury when [the act] is so inherently injurious that it cannot be performed without causing the resulting injury." (internal quotation marks omitted, alterations in the original)); *Jubin,* 236 A.D.2d at 713, 653 N.Y.S.2d 454 ("When the offensive contact alleged in the complaint is such that physical and/or emotional harm to the victim is inherent in the nature of the acts alleged, the courts have had little difficulty in finding that the resulting harm was expected or intended by the insured.").

In *Mugavero,* the Court of Appeals applied the inferred intent rule to a claim of sexual abuse of a young child. Emphasizing the "severe emotional and psychological damage that results from acts of sexual abuse, regardless of their motivation or nature," the court held that injuries resulting from such acts were, as a matter of law, intentionally caused within the meaning of a liability policy exclusion. *Mugavero,* 79 N.Y.2d at 161, 581 N.Y.S.2d 142, 589 N.E.2d 365. Subsequently, courts have followed the reasoning in *Mugavero* to apply the inferred intent rule to claims of sexual abuse of children and non-consensual sexual intercourse. *See, e.g., Distaffen,* 51 F.Supp.2d at 274 (sexual abuse of a minor); *Travelers Ins. Cos. v. Stanton,* 223 A.D.2d 104, 105–06, 645 N.Y.S.2d 948 (1996) (non-consensual sexual intercourse); *Pistolesi v. Nationwide Mut. Fire Ins. Co.,* 223 A.D.2d 94, 97, 644 N.Y.S.2d 819 (3d Dep't 1996) (rape); *Doe v. Allstate Ins. Co.,* 187 A.D.2d 181, 185, 596 N.Y.S.2d 603 (4th Dep't 1993) (sexual abuse of a minor); *cf. Tomain v. Allstate Ins. Co.,* 238 A.D.2d 774, 775–76, 656 N.Y.S.2d 470 (3d Dep't 1997) (applying the inferred intent rule to a claim of malicious prosecution).

In the context of professional malpractice, the issue of intent has been similarly

resolved in at least two cases decided under New York law. *See Aldrich v. National Chiropractic Mut. Ins. Co.*, No. 96–CV–847S, 1997 WL 662509 (W.D.N.Y. Oct.14, 1997); *Greenberg v. National Chiropractic Mut. Ins. Co.*, No. 96 Civ. 0052, 1996 WL 374145 (S.D.N.Y. July 3, 1996). The underlying claims in *Aldrich* and *Greenberg* were patients' claims of sexual abuse by insured chiropractors during treatment. *Aldrich*, 1997 WL 662509, at *1; *Greenberg*, 1996 WL 374145, at *1. The policies in both cases covered injuries caused by an "accident arising out of" the providing or failure to provide professional services to a patient. *Aldrich*, 1997 WL 662509, at *2; *Greenberg*, 1996 WL 374145, at *1. Although the *Aldrich* and *Greenberg* courts did not expressly apply the inferred intent rule, in both cases the courts concluded that because the underlying claims were based on intentional conduct, the claims did not arise out of accidents and, therefore, were not covered by the policies. *See Aldrich*, 1997 WL 662509, at *4–5; *Greenberg*, 1996 WL 374145, at *3.[8]

Dodge was not a minor during the underlying events, nor has she alleged nonconsensual sexual contact. *See* Pl. & Def. 56.1 ¶ 2; Verified Complaint, Ex. C. to Eisenman Aff. Morrison's alleged misconduct, therefore, may appear less extreme than acts traditionally held to be inherently harmful. Nevertheless, the unique nature of a therapist-patient relationship, recognized by the courts of this and other jurisdictions and supported by expert testimony in this case, leads me to conclude that the reasoning of *Mugavero* applies here.

An essential part of psychotherapy is the phenomenon of transference. Transference is a process whereby "the patient unconsciously projects his or her emotions, thoughts and wishes related to significant people in [her] past onto the psychiatrist." 1/21/00 Affidavit of Michael H. Stone,

M.D., Expert Psychiatrist ("Stone Aff."), Ex. C to Devine Aff., at 4–5; *see also, e.g., St. Paul Fire & Marine Ins. Co. v. Love*, 459 N.W.2d 698, 700 (Minn.1990) (describing the transference phenomenon). As the patient reveals to the therapist her innermost feelings and thoughts, the therapist comes to occupy a position of trust and power in the patient's life. The patient becomes emotionally dependent on the therapist and trusts the therapist to be always acting in her best interests. *See Vigilant Ins. Co. v. Employers Ins. of Wausau*, 626 F.Supp. 262, 266 (S.D.N.Y. 1986); *L.L. v. Medical Protective Co.*, 122 Wis.2d 455, 362 N.W.2d 174, 177–78 (Wis. App.1984); Stone Aff., Ex. C to Devine Aff., at 4–5.

These phenomena, if handled properly, may be effective therapeutic tools and may be utilized to the patient's benefit. They also, however, render the patient uniquely vulnerable to the therapist. Thus, it is widely recognized that a sexual relationship between a therapist and a patient irreparably disrupts the course of the treatment, as it inevitably undermines the patient's trust in the therapist. *See Vigilant*, 626 F.Supp. at 266; *L.L.*, 362 N.W.2d at 177–78 (quoting medical authorities for the proposition that a "sexual liaison [between a therapist and a patient] ... has all the earmarks of exploitation" and emphasizing the adverse effect of such liaison on the therapy and the patient's emotional health). When faced with this issue, courts have concluded that a therapist-patient sexual relationship endangers the patient's emotional health and is inconsistent with proper psychiatric practice. *See Snyder v. Major*, 789 F.Supp. 646, 649 (S.D.N.Y.1992) (summarizing the majority view that a psychiatrist's sexual conduct with a patient is a "failure in the delivery of professional services"), *modified*, 818 F.Supp. 68 (S.D.N.Y.1993); *Vigilant*, 626 F.Supp. at 266; *L.L.*, 362 N.W.2d at 177–

---

**8.** The policies also expressly excluded claims of sexual impropriety. *See Aldrich*, 1997 WL 662509, at *2; *Greenberg*, 1996 WL 374145, at *1.

78; Stone Aff., Ex. C to Devine Aff., at 4–6.

The harmful nature of a psychiatrist's sexual involvement with a patient is supported here by the expert testimony of Dr. Stone, a practicing psychiatrist and a professor of clinical psychiatry at Columbia College of Physicians and Surgeons. *See* Stone Aff., Ex. C to Devine Aff., at 1. According to Dr. Stone, sexual involvement constitutes a "betrayal of [the patient's] trust" and "permeates every aspects [sic] of the relationship between the doctor and the patient.... The very act of engaging in sexual activity necessarily by its nature harms the patient." *Id.* at 5. Having reviewed the testimony of Dodge and Morrison, Dr. Stone concluded "[w]ith reasonable medical certainty" that the transference phenomenon existed in the relationship between them, and that the alleged sexual relationship necessarily harmed a patient with Dodge's history of abuse and emotional problems. *See id.* at 5–6. For example, Morrison's betrayal of Dodge's trust had to make it very difficult for her to trust any new therapists or to form attachments with men in the future. Furthermore, the experience had to aggravate Dodge's preexisting emotional disorders. *See id.* Dr. Stone has also stated that a psychiatrist of Morrison's education and experience had to be aware of these necessarily harmful effects of a sexual relationship with the patient. *See id.* at 6–7.

■ Dodge has produced no evidence to counter Dr. Stone's opinion on the inherently harmful nature of the alleged misconduct. Dodge's argument on the issue of intent is based entirely on her own testimony and the findings of the Board of Professional Medical Conduct, which indicate that Morrison had coaxed Dodge into a sexual relationship with him by promising that it would improve her sex life. *See* Pl. and Def. 56.1 ¶ 11; Pl. Mem. at 13; Pl. Reply Mem. at 5–6.

Given the evidence presented and the judicial recognition of the harmful nature of the misconduct alleged here, I conclude

that Dodge's underlying complaint alleges, as a matter of law, non-accidental injuries. The inherently harmful nature of the alleged misconduct brings Dodge's claim within the inferred intent rule of *Mugavero* and its progeny. As in the *Mugavero* line of cases, cause and effect here are inseparable because the harm necessarily had to flow from the act. Furthermore, Morrison's alleged promise of improving Dodge's sex life is not sufficient to allow a reasonable trier of fact to find that Morrison did not intend to injure Dodge.

In arguing that her injuries must be deemed accidental absent evidence of Morrison's subjective intent to injure, Dodge relies primarily on *Public Service Mutual Insurance Co. v. Goldfarb*, 53 N.Y.2d 392, 442 N.Y.S.2d 422, 425 N.E.2d 810 (1981), *Vigilant Insurance Co. v. Kambly*, 114 Mich.App. 683, 319 N.W.2d 382 (1982), and *Vigilant Insurance Co. v. Employers Insurance of Wausau*, 626 F.Supp. 262 (S.D.N.Y.1986). *See* Pl. Mem. at 11–13; Pl. Reply Mem. at 1–6. In these three cases, the courts held that, absent evidence of an intent to harm, malpractice coverage for a physician's sexual activities with a patient did not contradict the state's public policy against indemnification for intentionally caused injuries. *See Vigilant*, 626 F.Supp. at 267; *Kambly*, 319 N.W.2d at 385; *Goldfarb*, 53 N.Y.2d at 399–401, 442 N.Y.S.2d 422, 425 N.E.2d 810. These authorities, however, do not require the result urged by Dodge. First, all three cases significantly predate *Mugavero* and its progeny. In light of the holding in *Mugavero*, it is far from certain that these courts would have reached the same conclusion today. Second, two of these cases, *Vigilant* and *Kambly*, both involving psychiatrists, are not binding on this Court. *Goldfarb*, on the other hand, while stating a binding principle of New York law, is clearly distinguishable because it involved sexual misconduct by a dentist, whose liability policy expressly included claims of sexual abuse. *See Goldfarb*, 53 N.Y.2d at 396, 398, 442 N.Y.S.2d 422, 425 N.E.2d

810. My conclusion here, in contrast, is based largely on the unique character of the therapist-patient relationship which makes the patient especially vulnerable to the therapist's misconduct.

Dodge relies heavily on a line of cases in which a therapist's sexual conduct with a patient was held to constitute malpractice for the purposes of professional liability insurance. *See Vigilant*, 626 F.Supp. at 265–66; *St. Paul Fire & Marine Ins. Co. v. Love*, 459 N.W.2d 698, 702 (Minn.1990); *Zipkin v. Freeman*, 436 S.W.2d 753, 761–62 (Mo.1968); *L.L. v. Medical Protective Co.*, 122 Wis.2d 455, 362 N.W.2d 174, 176–78 (App.1984) (the *"Zipkin* line of cases"); *see also* Pl. Reply Mem. at 6–8 (relying on the authorities cited above). Dodge's reliance on these cases, however, is misplaced. These courts focused on the interpretation of malpractice policy clauses that provided for coverage of claims "arising out of," "based on," or "resulting from" the rendering or failure to render psychiatric services. The courts were called upon to determine whether injuries caused by a therapist's sexual misconduct with a patient were sufficiently connected with the therapeutic relationship to fall within this coverage. Insurers argued that the sexual misconduct was independent of and unrelated to the doctor-patient relationship, and, therefore, was not covered by malpractice insurance. The courts rejected this argument based on the unique nature of the therapist-patient relationship and concluded that patients' claims of therapists' sexual misconduct fell within the scope of the malpractice policies. *See Vigilant*, 626 F.Supp. at 264, 265–66; *Love*, 459 N.W.2d at 699–702; *Zipkin*, 436 S.W.2d at 754, 761–62; *L.L.*, 362 N.W.2d at 175, 176–78. In sum, the common issue resolved by these courts was the issue of causation.

In contrast to the Legion policies, however, the policies interpreted by these courts did not distinguish between intentional and unintentional acts of malpractice. Nor did the policies contain exclusions comparable to the exclusions in Legion's policies. *See Vigilant*, 626 F.Supp. at 264–66, 266 n. 2 (suggesting that insurers "can exclude coverage of sexual activity between a psychiatrist and his patient from their policies, if that is what is desired"); *Love*, 459 N.W.2d at 702, 700 n. 3 [9]; *Zipkin*, 436 S.W.2d at 754; *L.L.*, 362 N.W.2d at 176. Accordingly, the holdings in these cases are inapposite.[10]

Equally misplaced is Dodge's reliance on *Snyder v. Major*, 789 F.Supp. 646 (S.D.N.Y.1992), *modified*, 818 F.Supp. 68 (S.D.N.Y.1993). In *Snyder*, the court held that a plastic surgeon's sexual abuse of a partially sedated patient did not constitute a "medical incident" within the meaning of the surgeon's professional liability policy. *See Snyder*, 789 F.Supp. at 651. In reaching this conclusion, Judge Wood expressly distinguished sexual misconduct by psychiatrists from sexual abuse by other physicians. Reiterating the reasoning of *Zipkin* and its progeny, Judge Wood emphasized

---

9. In *Love*, the court emphasized that the policy "[did] not contain an intentional act exclusion." *Id.* at 700 n. 3. The court further stated:

> If the underwriter does not want to provide coverage for this particular peril, it would seem it might exclude any claim for damages based on professional services in the treatment of transference which results in a sexual relationship between the insured and the patient.

*Id.* at 702.

10. Dodge also relies on the *Kambly* court's statement that there is "no reason for distin-

guishing between this type of malpractice and others." 319 N.W.2d at 384. In *Kambly*, however, the policy did not distinguish between intentional and unintentional acts of malpractice, nor did it contain an exclusion for claims of sexual misconduct. *Id.* (noting that the policy in question provided no exemption for claims of this type of malpractice). Furthermore, policy interpretation was not a contested issue on appeal. The insurer conceded that the policy, as written, covered the underlying claim, but argued that coverage should be denied for public policy reasons. *See id.*

the importance of the correct handling of the transference phenomenon to good psychiatric practice as the rationale for finding the requisite connection between psychiatric services and the harmful effect of the psychiatrist's sexual misconduct. The court concluded that this connection was lacking in cases involving non-psychiatrists. *See id.* at 649–51. Similarly to the *Zipkin* line of cases, therefore, *Snyder* addresses only the causation issue and provides no guidance with respect to interpreting Legion's policies.

### B. Section 3420(d) of the New York Insurance Law Does Not Apply to Dodge's Claim

■ Under section 3420(d) of the New York Insurance Law ("the statute"), an insurer that wishes to "disclaim liability or deny coverage for death or bodily injury arising out of a motor vehicle accident or any other type of accident occurring within this state" must give "written notice as soon as is reasonably possible of such disclaimer of liability or denial of coverage to the insured and the injured person or any other claimant." N.Y. Ins. Law § 3420(d) (McKinney 1985). The parties here agree that Legion did not notify Dodge of its intent not to indemnify Morrison for Dodge's claim. *See* Pl. & Def. 56.1 ¶ 26. The issue to be resolved, therefore, is whether the statute applies.

■ An insurer that fails to comply with the statute's notice requirement is generally estopped from disclaiming liability or denying coverage in the future. *See, e.g., New York Funeral Chapels, Inc. v. Globe Indem. Co.,* 33 F.Supp.2d 294, 300–01 (S.D.N.Y.1999); *Hamilton v. City of New York,* 256 A.D.2d 382, 681 N.Y.S.2d 563, 564–65 (2d Dep't 1998). The New York Court of Appeals has explicitly held, however, that the failure to disclaim cannot create coverage which the policy was not written to provide. *See Zappone v. Home Ins. Co.,* 55 N.Y.2d 131, 134, 447 N.Y.S.2d 911, 432 N.E.2d 783 (1982). In *Zappone,* the Court of Appeals concluded that the statute applies only to denials of liability "predicated upon an exclusion set forth in a policy which, without the exclusion, would provide coverage for the liability in question," and that "[i]t does not encompass [situations where] the policy as written could not have covered the liability in question under any circumstances." *Id.* For example, in *Zappone,* Home Insurance Company ("Home") issued an automobile liability policy covering one of Judith Zappone's two cars. Zappone's other, non-covered, car was involved in a collision, and Zappone notified .Home of a claim against her arising out of the collision. For more than a year thereafter, however, Home did not advise Zappone that it would not provide coverage. *See id.* at 134–35, 447 N.Y.S.2d 911, 432 N.E.2d 783. Zappone argued that Home's failure to give prompt notice under the statute obligated Home to provide coverage. The Court of Appeals disagreed, reasoning that the statute was not intended "to provide an added source of indemnification which had never been contracted for and for which no premium had been paid." *Id.* at 137, 447 N.Y.S.2d 911, 432 N.E.2d 783. The court concluded that the legislature intended the statute to apply only to "situations in which a policy of insurance that would otherwise cover the particular accident is claimed not to cover it because of an exclusion in the policy." *Id.* at 138, 447 N.Y.S.2d 911, 432 N.E.2d 783.[11]

In *Massachusetts Bay Insurance Co. v. National Surety Corp.,* 215 A.D.2d 456, 626 N.Y.S.2d 271 (2d Dep't 1995), the Ap-

---

11. The Court of Appeals recently reaffirmed the principle of *Zappone* in *Jefferson Insurance Co. of New York v. Travelers Indemnity Co.,* 92 N.Y.2d 363, 681 N.Y.S.2d 208, 703 N.E.2d 1221 (1998). The court stated that although the insurer must timely disclaim under the statute "where some ambiguity is present regarding the extent of coverage or any possible exclusions," failure to disclaim "cannot create coverage when none existed under the policy's terms." *Id.* at 370, 681 N.Y.S.2d 208, 703 N.E.2d 1221 (citing *Zappone* ).

pellate Division applied the rule of *Zappone* to a denial of coverage predicated on the policy's definition of the term "occurrence." The underlying action in *Massachusetts Bay* arose out of an altercation between a police officer and the insured, in which the insured became angered by the police officer's decision to issue a parking ticket and attacked the police officer, causing him physical injuries. *Id.* at 458, 626 N.Y.S.2d 271. The liability policy covered only claims for damages "caused by an occurrence," and the policy further defined an "occurrence" as an accident resulting in injuries that were "neither expected nor intended from the standpoint of the insured." *Id.* at 459, 626 N.Y.S.2d 271. The insurer sought a declaration that it was not obligated to defend or indemnify the insured in the underlying action because the injuries alleged were not caused by an occurrence. *See id.* at 458, 626 N.Y.S.2d 271. The Appellate Division held that the insurer's failure to give prompt written notice did not estop the insurer from disclaiming liability or denying coverage. Because the insurer contended solely that the conduct in question was not covered by the policy, and not that the conduct fell within any of the policy's exclusions, the court, relying on *Zappone*, concluded that the statute did not apply. *See id.* at 458–59, 626 N.Y.S.2d 271.

Legion's policies obligate Legion to indemnify Morrison only for claims arising out of acts or omissions that are "neither expected nor intended." As discussed above, Morrison's intentional sexual misconduct constitutes the entire factual basis of Dodge's underlying claim. Because the policies, as written, do not cover this type of misconduct, under the principle of *Zappone*, Legion's failure to give notice to Dodge cannot create coverage by estoppel.

Legion's policies also do not cover Dodge's claims because the claim falls within the policies' exclusion for claims arising out of incidents of "undue familiarity," which the policies define to include sexual involvement with a patient.[12] Under the rule of *Zappone*, a disclaimer of liability predicated on a policy exclusion is subject to the statute's notice requirement, provided that the claim is for an "injury arising out of a motor vehicle accident or any other type of *accident* occurring within this state." N.Y. Ins. Law § 3420(d) (emphasis added); *Zappone*, 55 N.Y.2d at 138, 447 N.Y.S.2d 911, 432 N.E.2d 783. "An 'accident,' under New York insurance law, is an event which from the insured's point of view 'was unexpected, unusual and unforeseen.' ... In addition, damages arising from an intended act may also be deemed accidental, so long as they arise out of 'a chain of unintended ... [subsequent] events.'" *Commercial Union Assurance Co. v. Oak Park Marina, Inc.*, 198 F.3d 55, 59 (2d Cir.1999) (citations omitted)(alteration in original). Damages are not deemed accidental, however, if they "flow directly and immediately from an insured's intentional act." *Id.* (internal quotations omitted).

It is undisputed that Dodge's claim arises out Morrison's inherently intentional sexual conduct. Dodge argues, however, that her underlying complaint nevertheless alleges an "accident" within the meaning of the statute because her claimed injuries constitute unintended consequences of intentional conduct. *See* Pl.

---

12. In its two reservation of rights letters to Morrison, Legion relied only on the policy exclusions and not on the definition of an occurrence. *See* 10/8/96 Letter of Kathleen Lamb, Assistant Vice President, Professional Risk Management Services, Inc., to Mark B. Morrison, Ex. H to Eisenman Aff.; 10/3/97 Letter of Kathleen Lamb, Assistant Vice President, Professional Risk Management Services, Inc., to Mark B. Morrison, Ex. I to Eisenman Aff. In its brief, however, Legion argues that the policies do not provide for coverage of Dodge's claims both because the claim arises out of intentional misconduct and because the claim falls within policy exclusions. *See* Memorandum of Law in Support of Defendant Legion Insurance Company's Motion for Summary Judgment at 16–20; Reply Brief in Opposition to the Plaintiff's Motion and in Support of Legion's Motion for Summary Judgment at 3–5.

Mem. at 3–5, 11–13; Pl. Reply Mem. at 1–6, 9. As discussed above, Dodge has failed to raise a genuine issue of fact as to Morrison's intent to injure her. Accordingly, Dodge's claim does not arise out of an "accident" as that term has been defined under New York insurance law.

In sum, the statute's notice requirement does not apply to Dodge's claim. First, Legion's policies as written do not cover injuries caused by intentional conduct. Second, even if the denial of coverage were based solely on policy exclusions, the statute would not apply because Dodge's injuries were not caused by an accident. Accordingly, Legion's failure to notify Dodge does not estop Legion from denying coverage.

### C. Public Policy of New York Prohibits Legion From Indemnifying Morrison

■ New York's public policy prohibits indemnification for intentionally caused injuries, but allows indemnification for accidental consequences of intentional conduct. *See Goldfarb*, 53 N.Y.2d at 399, 442 N.Y.S.2d 422, 425 N.E.2d 810. Dodge argues that her claim against Morrison falls in the latter category. *See* Pl. Mem. 11–13; Pl. Reply Mem. at 1–6. I have already addressed this argument in discussing the scope of coverage under Legion's policies in Part III.A. *supra.* For the reasons set forth therein, I conclude that as a matter of law Dodge's alleged injuries were intentionally caused by Morrison, and that the decisions in *Kambly, Goldfarb,* and *Vigilant* do not command a contrary result. Furthermore, unlike the court in *Kambly,* I find that the misconduct alleged here fully implicates the public policy considerations underlying the prohibition of coverage for intentionally caused injuries. If

psychiatrists know they will bear the consequences of their sexual improprieties with patients, and cannot pass those costs on to their malpractice insurers, they may be more likely to avoid such incidents. Thus, the denial of coverage in such cases will have a strong deterrent effect. In addition, shifting the cost of the liability onto the insurer will allow the wrongdoer to evade responsibility for his actions.[13]

Thus, even if Morrison were entitled to indemnification by Legion, either because Dodge's claim fell within the coverage afforded by Legion's policies or because of estoppel due to the failure to provide timely notice, the indemnification would still be prohibited as contrary to the public policy of New York.

### IV. Conclusion

For the foregoing reasons, the defendant's motion is granted. The Clerk of the Court is directed to close this case.

SO ORDERED:

---

13. I am not persuaded by the argument advanced in *Kambly* that this type of misconduct does not implicate public policy considerations because the benefit of coverage goes to an innocent injured party rather than the wrongdoer. *See Kambly,* 319 N.W.2d at 385. This argument is overinclusive because it would apply to all victims of intentional wrongdoing, such as those harmed by assault or defamation. Thus, this factor does not help in distinguishing the injury at issue here from the more "traditional" types of intentionally caused injuries.